Old Furnace Coal Co. *v.* Wilson et al., Appellants.

Argued October 5, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN and BARNES, JJ.

 

*E. S. McNamee,* with him *Reed & Ewing,* and *Howard D. Montgomery,* for appellants.

*Thompson Bradshaw,* of *Bradshaw, McCreary & Reed,* for appellee.

OPINION BY MR. JUSTICE MAXEY, December 5, 1938:

Plaintiff, the Old Furnace Coal Company, filed a bill in equity praying, inter alia, that the defendants, Sarah M. Wilson and William T. Wilson, husband and wife, and the owners respectively in severalty of certain adjoining land in Franklin Township, Beaver County, be restrained from forfeiting the lease of coal land entered into on March 25, 1935, between them and J. C. Irwin, and subsequently assigned to plaintiff, and that the attempted forfeiture be declared ineffective. As the court below said: "The first and most important question in the case is as to the effect of this attempted forfeiture of the lease. Plaintiff contends that there was in fact no default in the payment of royalties under the lease at the time the notice of forfeiture was given."

The Chancellor found, inter alia, the following facts: That prior to March 25, 1935, Irwin was engaged in "strip mining" of coal on the Wilson land under a lease entered into between him and the Wilsons, that at that time M. S. Johnston and his mother, K. E. Vance, were mining coal in another county under the partnership name of the Vance Coal Company, of which Johnston was the sole manager; that Johnston on behalf of the Vance Coal Company made arrangements with Irwin whereby if a new lease could be secured from the Wilsons, there would be organized a corporation to be called the "Old Furnace Coal Company" for the purpose of mining the coal on the Wilson land; that on March 25, 1935, the Wilsons and Irwin executed a new lease for the sale of coal in place under a part of each of their (the Wilsons') respective pieces of land, with the right to mine and remove and market the same, and with certain

surface rights incident thereto; that the Old Furnace Coal Company (the plaintiff) was thereafter incorporated; that on April 6, 1935, Irwin assigned the lease to this latter company and it continued to mine coal by the stripping method on the premises "to the day of the trial of the case (March 30, 1937) and is now engaged in such operation."

The Wilsons by notice, dated October 8, 1935, and served on plaintiff on October 11, 1935, undertook to cancel and terminate the lease on the ground that no royalties had been paid to them in accordance with its terms. Plaintiff contends that the royalties had been paid up to and including October 1, 1935, and that this payment was made by crediting the amount of royalties earned during the period upon a note given in the amount of $800 by the Wilsons on May 7, 1935, to the Vance Coal Company for a loan made to them by that coal company, which note was in September, 1935, assigned to plaintiff coal company. The plaintiff coal company mailed to the Wilsons this note with the credits endorsed thereon and marked "Paid in Full," together with a check for $412.12, additional current royalty then due. This note and check were returned to the coal company with a renewed notice of forfeiture.

The lease also contained a provision giving the coal company an option to lease certain other land belonging to the Wilsons during the term of the lease on terms identical with those contained in it as to the land first leased, with the exception that the royalty to be paid upon the coal covered by the option was a few cents per ton in excess of that payable under the existing lease. Simultaneously with the service on the Wilsons, on December 6, 1935, of the bill of complaint, they were served written notice of the election of plaintiff as lessee to exercise this option.

Plaintiff prayed not only that the lease be held to be in full force and operation, but also that the election of the plaintiff to exercise the option contained in the lease be

declared effective, and to decree that "the defendants shall execute and deliver the documents appropriate and necessary therefor." The defendants in their answer asked the court below to hold that the forfeiture and termination of the lease by the notice of October 8, 1935, was effective, and that the rights of the plaintiff, both as to the land originally leased and the land optioned, were at an end.

As to the aforementioned loan of $800 and the note issued thereon, defendant, William T. Wilson, testified that during the spring of 1935 one William H. Steffler through his attorney had been pressing this witness and his wife for the payment of two judgments held by Steffler, one against the witness and one against his wife, and that Steffler notified defendants that these judgments must be paid or a substantial payment made thereon or execution would be issued and sale made of defendants' properties. The witness then testified that he went to Mr. Johnston, who is one of the two partners of the Vance Coal Company, and asked for a loan of $1,000 in order to make a payment on account of this judgment, that Johnston told him that "$800 was all he could spare," that later the loan was made and the note given, and the money paid to Steffler's attorney. He also testified that his wife signed the note without objection.

Sarah M. Wilson, defendant, testified that she signed the note in question because "Mr. Wilson asked me to," that she never talked to Mr. Johnston about this note or the payment of it, that she knew that Mr. Steffler's attorney "warned Mr. Wilson" that payment must be made on the judgment, that she knew her husband was getting the money to take care of this judgment, and that Mr. Wilson got the money, "I didn't get it."

Johnston testified that Mr. Wilson came to him at the mine and told him that his creditors demanded money, and that one in particular wanted $1,000 or he would sell the farm and that there was "our lease and everything and he would lose everything if he didn't have some

money." Johnston said he replied: "Mr. Wilson, if that is the circumstances, we will have to help you out. How are you going to pay this money back?" Wilson answered: "You will be mining coal and you can take it off the royalties, and my wife has some money coming from California. She has a lot of property and as soon as they dispose of the property that would pay it off. And, if we don't, it would apply on the royalties." Wilson denied that there was any arrangement made "with regard to the application of royalties to the payment of the note." Johnston testified that the check he gave to Mr. and Mrs. Wilson was signed by Mr. Wood, the bookkeeper of the Vance Coal Company, and by himself, and that it was drawn against the funds of that company. He also stated that the note for $800 was endorsed by his mother, K. E. Vance, and himself and discounted at the bank, and that, by check dated July 5, 1938, and made out to this bank by the Vance Coal Company and signed by Wood and himself, this discounted note was paid off. Johnston testified further that he held the note in his possession after that and in September, 1935, he put this endorsement on it: "Old Furnace Coal Co., Inc., M. S. Johnston, Treasurer," and held it "a while and then turned it over to the Old Furnace Coal Company." He also said that he made certain entries of payments of royalties due for April, May, June, July, August and September, in various amounts on the back of this note and wrote below them: "Paid by royalty, including interest," that he made these entries and the notation on October 1st when the royalties up to that time realized enough money to pay off the note, and that he mailed the note sometime before October 10th to Mr. Wilson together with a statement of his royalty account, that on October 11th he received the notice from Mr. Wilson declaring the forfeiture of the lease, that in November he returned the note to Wilson together with a check for $412.12 for royalties due in October, that Wilson sent these back to him, and that he personally again tendered

the note to Mr. and Mrs. Wilson at their home about November 10th and also legal tender in the amount of $412.12, all of which they refused. Johnston also said that from the time he got the lease down to the date he received the first notice of its forfeiture, Mr. or Mrs. Wilson never made any demand upon him or upon the plaintiff coal company for payment of royalties, and that during that time statements were rendered to the Wilsons showing how much coal was being mined.

The Chancellor's conclusions of law were, inter alia, as follows: That defendants Wilson "entered into a common or joint enterprise" as to the land leased and optioned, and "the words and acts of each as to the subject matter of the enterprise and in the furtherance thereof, are the words and acts of both"; that "under the terms of the lease, royalties on coal produced from any part of the leased premises are payable to either or both of said lessors, and the lessee is protected by payment of such royalties to either or both"; that "a divestiture of lessee's title as to part of the leased land would defeat the entire contract"; that "the sale of the leased premises, or any part thereof on execution issued upon the judgments of William H. Steffler," against S. M. Wilson and W. T. Wilson, respectively, "or on execution upon either of them, would have destroyed the rights of the lessee under the lease, the lien of judgments being prior to the execution and delivery of the lease"; that both lessors were obliged to protect the leased premises or any part thereof from sale on execution; that when "Mr. Wilson entered into the agreement with Johnston," for the making of the $800 loan, "he was taking steps to meet the obligation of both himself and Sarah M. Wilson to protect the title of the lessee under the lease"; that "Sarah M. Wilson was legally bound by the agreement as to said loan of $800 made by William T. Wilson"; that, in executing the note for $800 in favor of the Vance Coal Company, Mrs. Wilson contracted as an original borrower with her husband "for a purpose and in an inter-

est common to both, and not as an accommodation maker or surety"; that there was a valuable consideration running to Sarah M. Wilson for the making of this loan, and for the execution and delivery of the note to secure the same; that "the application of the proceeds of the loan to the judgment against William T. Wilson alone did not change the character or purpose of the loan and the note, since it resulted in the stay of execution upon both of the Steffler judgments"; that the agreement of William T. Wilson and M. S. Johnston that the proceeds of the loan should be paid by the application to it of royalties accruing, was binding on Sarah M. Wilson; that at the time of the attempted forfeiture of the lease, to wit: Oct. 8, 1935, "no ground of forfeiture existed by reason of any default in payment of royalties"; that the evidence does not disclose any other ground for the forfeiture of the lease; that the lease is still "in full force and virtue"; and further that the lessee rightfully exercised the option contained in the lease and is the owner of the coal in place in and under the land covered by the option. The court thereupon entered an appropriate decree nisi.

Defendants, Wilson and wife, filed exceptions to most of the findings of fact and conclusions of law and to the decree nisi. All the exceptions to the findings of fact were overruled except in so far as the court below adopted the same in making some additional findings. All the exceptions to the conclusions of law were overruled and the decree nisi was directed to be entered as the final decree. Defendants, Wilson and wife, appealed.

The first question for determination by the learned Chancellor was whether any arrangement had been entered into between Johnston and Wilson for the payment of the $800 note by crediting royalties against it. The determination of this question was merely a matter of the respective credibility of Johnston and Wilson. The Chancellor reviewed the testimony of Wilson very fully and stated his conclusion that Wilson was "at-

tempting to evade the truth" and that his testimony was "unworthy of belief." On the other hand, the Chancellor characterizes Johnston as "a very frank, straightforward and credible witness." As the credibility of these witnesses was a matter for the determination of the court below, we cannot interfere with its finding of fact based on the testimony of either or both of these witnesses.

Appellants also contend here, as they did in the court below, that Mr. Wilson alone was bound by the agreement as to the payment of the note and that in executing this note for $800 Mrs. Wilson "acted as an accommodation maker for the benefit of her husband and not as an independent borrower in her own right." The court below found that "in the making of the loan of $800 and in the giving of the note of May 7, 1935, to secure the same, Sarah Matilda Wilson was not acting as an accommodation maker or surety, but in her own right and in her own interest, with her husband who was in like manner interested." The court correctly held that while the parcels of land which constituted the tract leased were held in severalty, the lessee was entitled to treat the leased premises as an entity. Since there was nothing in the lease which stipulated that the lessee was to pay royalty severally, payment to both or either of the lessors acquitted him of his liability.

The court below further aptly said: "The title of William T. Wilson and the title of Sarah Matilda Wilson were both threatened by the proposed execution upon the two Steffler judgments. This is clear from the admission of William T. Wilson himself hereinbefore referred to. Both Mr. and Mrs. Wilson were vitally interested in preventing the sale of their property under the executions upon the Steffler judgments. It seems clear to us, therefore, that when William T. Wilson negotiated the loan of $800 to Vance Coal Company with Mr. Johnston he was acting not only for himself but for Mrs. Wilson as well, in view of their common obligation under

the lease and their common interest in the leased premises. We are satisfied that the acts of Mr. Wilson in negotiating this loan, in effecting it, and in agreeing as to the manner in which it should be repaid, were in effect the acts of Mrs. Wilson also. Mrs. Wilson signed the note with her husband, and with him endorsed the check which was made payable to both of them to cover the proceeds of the loan. The money thus realized was paid to Mr. Steffler, the judgment creditor. . . . While Mr. Steffler applied the proceeds of the loan to the judgment against William T. Wilson alone, the payment was effective in preventing execution upon both judgments and in saving the property of both defendants from sale."

In support of the court's conclusion as to the foregoing is the significant fact that neither Mr. nor Mrs. Wilson made any demand for the payment of royalties at the time the $800 note was in existence and made no inquiry as to whether or not the note had been paid and they paid nothing by cash or check on account of the indebtedness the note secured. Upon no other theory than that adopted by the court, to wit, that royalty payments due the Wilsons were being applied on the note, is their conduct at this period explicable.

Having found as a fact from the evidence that there was no default in the payment of royalties due William T. Wilson and Sarah M. Wilson, under the provisions of the lease of March 25, 1935, the decree entered in this case by the court below logically followed, and it is not necessary to a decision of this appeal to discuss the proper procedure for declaring a forfeiture and to reiterate the principle that to terminate a lease for failure to pay the stipulated rent requires affirmative action on the part of the lessor. The question is fully discussed in the able and comprehensive opinion of President Judge READER of the court below. The cases of *McKean Natural Gas Co. v. Wolcott*, 254 Pa. 323, 98 A. 955; *Wills v. Natural Gas Co.*, 130 Pa. 222, 18 A. 721; *Ray v. Western Penna. Natural Gas Co.*, 138 Pa. 576, 20 A. 1065, and

many others in which this subject is discussed are all quoted from or cited in the opinion of the court below. In *Thompson v. Christie,* 138 Pa. 230, 249, 20 A. 934, this court said: "The rule undoubtedly is that the right to declare a forfeiture must be distinctly reserved; that the proof of the happening of the event on which the right is to be exercised must be clear; that the party entitled to do so must exercise his right promptly; and that the result of enforcing the forfeiture must not be unconscionable." The court below after reciting certain pertinent facts, including the fact that the plaintiff below had invested $17,000 in "the development of the territory" and though residing near plaintiff's mining operation defendants made "no suggestion of an intention to declare a forfeiture," from "April or May 1935 down to the time when notice of forfeiture was given in October," well says: "There was an unreasonable delay on the part of lessors in declaring their intention to forfeit the lease, and the forfeiture would work such an injury to the lessee, without corresponding advantage to the lessor as to be highly unconscionable."

Another question raised by appellants, as set forth in the statement of questions involved, is the following: "Is there a sufficient consideration for an option in a lease to lease other lands where the only consideration is performance of the conditions of the lease as to lands covered thereby and such conditions have not been complied with?" This question the court below answered in the affirmative, saying: "We are satisfied that a sufficient consideration is found in the terms of the agreement as a whole. It is not necessary that a separate consideration be stated for the option itself. The lessee may well have declined to take a lease upon the tract of land first leased by the instrument without having as well the option upon the other land." In this and all other conclusions reached by the court below, we find no error.

The decree is affirmed at appellants' cost.