Burbage *v.* Boiler Engineering & Supply Company, Inc. (et al., Appellant).

Argued April 19, 1968. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*James E. O'Neill, Jr.,* with him *Susan P. Windle, William H. Lamb,* and *Rogers & O'Neill,* for appellant.

*Richard Reifsnyder,* with him *MacElree, Platt, Marrone & Harvey,* for defendant, appellee.

*C. Richard Morton,* with him *Griffith, Morton & Buckley,* for plaintiff, appellee.

OPINION BY MR. JUSTICE JONES, January 24, 1969:

On September 9, 1963, while engaged in employment with Friedman and Sons, Inc., Edmund Burbage (decedent) was killed when a boiler exploded. This boiler, manufactured by Boiler Engineering and Supply Company, Inc. (Boiler), contained a valve manufactured by General Controls, Inc. (General). This valve was not part of the original boiler but was sold as a replacement unit for a boiler which was already in existence. The explosion occurred when General's valve stuck in the open position, permitting an excessive amount of fuel to enter the ignition chamber. The sticking of this valve was caused by an indentation in the face of the valve. General urges that the valve was manufactured as one with a 120 coil and was changed to one with a 220 coil, which change, alleged-

ly, took place between the time the valve left General's hands and the time it reached Friedman's hands.[1]

. There is no evidence whether the valve came into the hands of Boiler directly from General or through the hands of an independent jobber and there was conflicting evidence as to when the change in the valve stamp was accomplished.

On the theory that Boiler had manufactured and sold to Friedman, Burbage's employer, the boiler which exploded, Burbage's personal representative (Burbage) instituted a suit for damages arising from decedent's death against Boiler in the Court of Common Pleas of Chester County. On the theory that General had manufactured the valve which had been incorporated into the boiler and, therefore, allegedly was responsible for the defect in the valve which caused the explosion, Boiler joined General as an additional defendant on the alternative theories that General was liable, jointly or severally, to Burbage or that, in the event Boiler was held liable, General was liable by way of indemnity to Boiler.

The case was submitted to the jury on the theory of strict liability under §402A of the Restatement 2d, Torts. The jury returned a verdict against Boiler and in favor of Burbage in the amount of $70,000.00 and in favor of Boiler against General for indemnification in the amount of $70,000.00.

General filed motions for judgment n.o.v. or, in the alternative, a new trial. After argument, the court ordered a new trial unless Burbage filed a remittitur

---

[1] General's quality assurance engineer testified that the numerals "338" were stamped on a metal nameplate on the valve; the first "3" indicated pipe size; the second "3" the part size, and the "8" the voltage; that on this valve the "338" had been stamped in larger type than the other numerals indicating the operating voltage of the coil had been changed from 120 to 220, and that General did not manufacture a valve with a 220 coil.

"of record" in the amount of $1,712.40 in the wrongful death action within twenty days. No remittitur was filed within the twenty-day period but Burbage later petitioned the court to file a remittitur *nunc pro tunc* after receiving the amount of the verdict, as reduced by the amount of the remittitur, from Boiler. The court below discharged the rule to file the remittitur on the theory that Burbage's acceptance from Boiler of the amount of the verdict, as reduced by the remittitur, constituted a *de facto* acceptance of the remittitur. Thereafter, judgment was entered by Boiler against General, and from that judgment the instant appeal was taken.

Initially, General contends that since the valve was substantially changed after it left the hands of General, it cannot be held liable under §402A of the Restatement 2d, Torts. If the valve was substantially changed after it left the hands of General, clearly General would be correct. However, under the factual posture presented in the case at bar on appeal, this rule of law is inapplicable because the jury found that there was *no* substantial change in the valve once it had left the hands of General.[2]

It is not the function of an appellate court to pass upon the credibility of witnesses or to act as the trier of facts, and we will not substitute our judgment for that of the fact-finding jury, if there is sufficient evidence of record to support the jury's findings of fact. *Gaita v. Pamula*, 385 Pa. 171, 122 A. 2d 63 (1956). See also: *Kalyvas v. Kalyvas*, 371 Pa. 371, 89 A. 2d 819 (1952); *Old Furnace Coal Co. v. Wilson*, 332 Pa.

---

[2] A. W. Grosvenor, a qualified metallurgical engineer, examined the valve and expressed the opinion that the dent or indentation on the valve face which caused the explosion was in the original manufacture and that the stamping upon the face of the valve concerning the voltage had nothing to do with the explosion. Such testimony was in support of the jury's finding.

208, 3 A. 2d 336 (1938); *Milford Borough v. Burnett,* 288 Pa. 434, 136 A. 669 (1927). Even though we might be of the opinion that had we been the finders of fact we would have reached a contrary result, nevertheless, we will not set aside the findings of fact of a jury implicit in its verdict which are evidentiarily supported of record and where there was no abuse of discretion and where no error of law has been committed. *Koch v. Imhof,* 315 Pa. 145, 172 A. 672, 673 (1934); *Hegarty v. Berger,* 304 Pa. 221, 155 A. 484 (1931).

We have examined the present record and find that, although there was conflicting evidence as to when the defect occurred, there was ample evidence from which the jury could reasonably impose liability upon General, the manufacturer of the valve. The jury did so find upon evidence sufficient quantitatively and qualitatively and we are powerless to find to the contrary. To do otherwise would capriciously disregard the traditional function of the trier of fact.

General next contends that §402A, supra, does not apply to *component parts.* Comment q to §402A, supra, provides: ". . . Component Parts. The same problem [application of strict liability] arises in cases of the sale of a component part of a product to be assembled by another, as for example, a tire to be placed on a new automobile, a brake cylinder for the same purpose, or an instrument for the panel of an airplane. Again the question arises, *whether the responsibility is not shifted* to the assembler. *It is no doubt to be expected that where there is no change in the component part itself but it is merely incorporated into something larger, the strict liability will be found to carry through to the ultimate user or consumer.* But in the absence of a sufficient number of decisions on the matter to justify a conclusion, the Institute expresses no opinion on the matter." (Emphasis supplied)

It is pertinent to note that this particular valve was found by the jury to have been sold in a defective condition and without ever having undergone any substantial change subsequent to its original manufacture. The valve itself was to be ultimately incorporated into a boiler since it had no operative significance or independent utility apart therefrom. In similar situations other jurisdictions have determined that liability will be fastened on a component-part manufacturer when there had been no change in the part after it left the factory in which it was manufactured. See: *Deveny v. Rheem Manufacturing Co.*, 319 F. 2d 124 (2d Cir. [Vt.], 1963); *Putnam v. Erie City Mfg. Co.*, 338 F. 2d 911 (5th Cir. [Tex.], 1964). In view of the fact that the jury found no substantial change in the valve since manufacture and since it was to be merely incorporated into a larger product, we see no reason why liability should not carry through to the valve manufacturer, General, as the manufacturer of a defective component part.

General's third contention is that, even if the product was defectively manufactured, the buyer (Boiler) knew or should have known of the defect and, therefore, voluntarily and unreasonably assumed the risk of the danger. We find no merit in this contention. Comment n of §402A, supra, explicitly states: "Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, as to guard against the possibility of its existence. On the other hand, the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and nevertheless proceeds

unreasonably to make use of the product and is injured by it, he is barred from recovery." There is no evidence whatsoever that Boiler did, in fact, discover the defect before proceeding to utilize and market the valve.

We also hold that Boiler did not assume the risk by using the valve because there is no reason why it should have discovered the defect. Since this particular valve was merely sold as a unit and was not affixed to the boiler prior to its being sold to decedent's employer but was sold as a replacement unit to be affixed to a boiler already in operation, we conclude that there was no reason why Boiler should be primarily liable. If such a valve was affixed prior to the entire product being sold to the purchaser, i.e., Friedman and Sons, Inc., then it might be said that the primary responsibility for the defect was shifted to the intermediate party, i.e., Boiler, since it presumably would have tested the boiler. Since that was not the situation in this case, it is necessary to conclude that the responsibility for discovery and prevention of the defect lay solely with General.

General further urges that Boiler is not entitled to indemnification from General under §402A, supra. The right of indemnity rests upon a difference between the primary and secondary liability of two persons each of whom is made responsible by law to an injured party. The right to indemnity enures to a person who, without active fault on his own part, has been compelled by reason of some legal obligation to pay damages occasioned by the negligence of another. The difference between primary and secondary liability is not based on a difference in degrees of negligence or on any doctrine of comparative negligence but rather on a difference in the *character* or *kind* of the wrongs which cause the injury and in the nature of the legal

obligation owed by each of the wrongdoers to the injured person. Secondary as distinguished from primary liability rests upon a fault that is imputed or constructive only, being based on some legal obligation between the parties or arising from some positive rule of statutory or common law or because of a failure to discover or correct a defect or remedy a dangerous condition caused by the act of the one primarily responsible. *Builders Supply Co. v. McCabe*, 366 Pa. 322, 77 A. 2d 368 (1951). Cf. *Martinique Shoes v. New York Progressive Wood Heel Co.*, 207 Pa. Superior Ct. 404, 217 A. 2d 781 (1966).

Under the strict liability theory of §402A, Burbage could have sued General and, under the evidence presented, could have received a judgment against General. Instead, Burbage sued Boiler. It would be transparent reasoning of the highest order to conclude that recovery could not be had by Boiler from General in the nature of indemnity. Nothing Boiler did exonerated General from being primarily liable for the accident. First, Boiler had no duty to inspect which would have precluded it from recovery under the assumption of risk provision in §402A. Second, the jury determined upon the basis of sufficient evidence that there was no substantial change in the valve subsequent to its leaving General's hands.

General next asserts that it is entitled to a new trial due to Burbage's failure to accept the remittitur within the twenty days stipulated in the court's order. All parties concede that Burbage did not file the remittitur *of record* in accordance with the mandate of the lower court. However, the evidence is clear that Burbage did, in fact, accept, and the original defendant Boiler did, in fact, pay, the reduced amount of the wrongful death award within the twenty day period. Since the remittitur order was in essence com-

328

plied with within the specified twenty days, we perceive no reason not to allow the remittitur order to be filed *nunc pro tunc*. In similar situations, courts have been reluctant to send the case back "after it has been tried on its merits, on nice technical objections, not in any degree affecting the merits": *Jones v. Stiffler*, 137 Pa. Superior Ct. 133, 138, 8 A. 2d 455 (1939). See also: *Motor Mortgage Corp. v. Hagerling*, 106 Pa. Superior Ct. 148, 161 A. 447 (1932); *Parkin v. Safe Deposit Bank*, 54 Pa. Superior Ct. 54 (1913).

Judgment affirmed.

Mr. Justice MUSMANNO did not participate in the decision of this case.