DOW CHEMICAL COMPANY, Plaintiff-Appellee-Cross Appellant,

v.

INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO, et al., Defendants-Appellants-Cross Appellees.

No. 72–1369.

United States Court of Appeals, Fifth Circuit.

June 12, 1973.

Rehearing Denied Aug. 7, 1973.

Frank E. Hamilton, Jr., Tampa, Fla., Winn Newman, Gen. Counsel, International Union of Electrical, Radio & Machine Workers, AFL–CIO, Irving Abramson, Richard Scupi, Washington, D. C., for defendants-appellants.

Jesse S. Hogg, Coral Gables, Fla., for plaintiff-appellee.

Before COLEMAN and SIMPSON, Circuit Judges, and ESTES, District Judge.

COLEMAN, Circuit Judge:

On an around the clock, three shifts basis, Dow Chemical Company owned and operated a plant at Tampa, Florida, which produced polyethylene containers, mostly for the Clorox Company. Dow's employees were represented by the International Union of Radio, Electrical and Machine Workers, AFL–CIO and its affiliated Local 153. The contract between the union and the company had a no-strike clause which provided for a mandatory three-step grievance procedure for the settlement of company-union disputes and which further agreed that no strike might be instituted prior to the exhaustion of this procedure.

This litigation had its incipiency on the morning of December 29, 1964. Charles Winn, a plant employee and President of Local 153, was on duty along with Millard Crunk, chief steward for the local. They informed the plant manager that they wanted to leave work for the purpose of going to the union hall to discuss union business with Joseph Considine, IUE field representative. Crunk was granted the requested permission but Winn was told not to leave until he had a replacement. It was ascertained that a replacement was available but that it would be some time before he could get to work. Winn would not, and did not, wait for the arrival of his replacement. The manager warned him that if he left work without permission he would be subject to appropriate discipline.

That afternoon, Winn received a disciplinary suspension for leaving work without permission. The next day the plant employees protested the suspension by staging a six hour walk-out. The plant manager protested to an IUE field representative that the work stoppage was illegal but the representative declined to urge the employees to return to work. The manager then contacted his superior officers who protested directly to IUE headquarters in Washington. That office instructed a return to work.

After an investigation which caused the plant manager to conclude that Winn and Crunk were responsible for the illegal work stoppage, they were terminated as employees. The next day, January 6, 1965, Considine, the union field representative, demanded an immediate meeting with the plant manager to discuss the Winn-Crunk termination. Three meetings failed to secure the reinstate-

ment of the former employees and a strike was called, continuing from January 7 until February 2 when it was terminated by a state court injunction

On February 28 the collective bargaining agreement between Dow and IUE expired. By agreement it was extended until March 14. No contract being reached, a new strike began on March 15, lasting until April 29. The legality of this second strike is not in issue.

Dow sued the union for damages for the illegal work stoppage and for the first strike, § 301 of the Labor Management Relations Act of 1947; 29 U.S.C. § 185. The case was tried to the District Court without a jury. Punitive damages were disallowed, but judgment for actual damages was entered in the sum of $297,607.65. The award was broken down as follows: for the unlawful work stoppage, $1,038; for the January 7– February 2 strike, $291,779.65; for legal expenses incurred in bringing the unlawful strike to an end, $4,790. The union appeals from the damage award and Dow cross appeals from the denial of punitive damages.

 The union does not contest all liability but argues that the damage award was too broad in both scope and time.

In compliance with the well known principles of the Clearly Erroneous Rule, we shall not here retry the factual issues nor do we consider it necessary to burden this opinion with an extended descriptive or historical recital of the conflicting factual contentions. We are entirely confident that the findings of fact entered by the trial court are substantially supported by the evidence in the record:

1. The work stoppage and the first strike were in breach of contract;

2. The damages sustained by the company were caused by the January strike rather than by the latter one which the union abandoned because it was unsuccessful;

3. The adverse effects of the strike continued to manifest themselves until June 30, 1965;

4. The strike caused ruinous stresses on plant equipment when management tried to operate with replacement employees; massive repairs were done in June, to the further diminution of production;

5. Supported by the company's operation records, comparing actual sales with reasonably anticipated sales as well as considering both fixed and variable production costs as adversely affected by the January strike, the total damage figure can reasonably be fixed at $291,779.-65.

The judgment in favor of Dow is affirmed.

 This leaves for consideration the punitive damages issue raised by the cross appeal.

In its order of December 29, 1969, the District Court described the testimony on the issue of punitive damages as follows:

"Involved here are 120 pieces of testimony to which objection was made. The testimony is by various witnesses and is a melange of various allegations and information. Samples of it include testimony that a witness heard officials of the local and international make threats of bombing the plant; that an international field representative instructed strikers to block ingress and egress to the plant; that a local official advised sabotage of machinery; that an international field representative advised stripping the clothes off female strike-breakers; that an international field representative was present when the president of the local threatened to hire out-of-town hoodlums; that officials of both defendants participated in the mass picketing and shouting from the picket line; that one persons's car was shot at, another's hit by a shot from a BB gun operated by unknown assailants; that one woman found a nox-

ious thing attached to her car by persons unknown; that strange cars prowled about the houses of strikebreakers; that various acts of violence or danger were committed by persons unknown or strikers; and so on."

Our reading of the record has prompted no disagreement with the above summary.

The District Court then considered the punitive damage impact of this testimony as against the International Union as follows:

"Considering each of the 120 portions of disputed testimony by itself, and remembering that the ordinary law of agency does not apply, there is no proof, as to any one, that the defendant international authorized, ratified, or participated in the tortious acts enumerated. There is, of course, proof that individual members and officers of the defendants, as well as persons unknown, committed acts of tort.

"Considering the 120 pieces of testimony as whole, the requisite authorization, ratification, or participation, as well as clear proof thereof, is also lacking. Putting all the acts mentioned in the testimony together, there is not clear proof that the defendant endorsed any or all of these acts. The same is true when the testimony is examined in the light of plaintiff's entire case."

Again, we agree that this summarization finds support in the record.

Dow Chemical, the cross-appellant, contends, however, that the International Union is nevertheless liable because three of its field representatives actively participated in the above described conduct and that "the participation of the three was in effect the participation of the International Union".

This brings us face to face with the provisions of § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, which reads as follows:

"No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

As the District Court quite correctly pointed out, the decisions in this field, dealing particularly with the appropriate interpretation and application of § 6, are quite sparse. Without considering it necessary to rehash the issues there involved and the decisions there rendered, we have directed out attention to the decisions of the Supreme Court in United Brotherhood of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L. Ed. 973; United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218, as well as to the decision of the Sixth Circuit in United Mine Workers of America v. Meadow Creek Coal Company, 263 F.2d 52 (1969), cert. denied, 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038.

These cases, of course, do not strike directly at the factual situation encountered in the instant appeal.

Viewing the record as a whole, we agree with the District Court when it found as follows in its order of December 29, 1969:

"The Court holds, however, as to the international, that the testimony does not meet the stringent standards of § 6. None of the acts contained within the testimony—whether viewed singly or in totality—is supported by clear proof of endorsement by the international. Section 6 is not a rule of evidence, making the testimony inadmissible; it merely defines the type of proof and incidentally establishes the quality of proof necessary to hold unions liable. The testimony here is an aggregation of information about acts committed by certain persons at

certain times. No nexus connects these acts to the union in the degree required by § 6. The testimony objected to, therefore, is material but irrelevant. It is directed to the issue of tort liability on the part of the union but it fails to be probative of this issue because the acts enumerated in the testimony are not connected to the union.

"Evidence in the form of testimony as to the acts of union officials and members, and others, without more, is not indicative of union responsibility for the torts committed. In the absence of union authorization, participation, or ratification, such testimony does not tend to show liability upon the part of the union."

We weigh this in light of the fact that this indefensible, indeed reprehensible, conduct was that of local union representatives on the scene—not that of officers of the union. We do not have here the actions of an international board member, as in United Mine Workers v. Meadow Creek Coal Company, *supra,* nor do we have the union authorization or ratification which were specifically found to be present in that case. Indeed, the international board member in *Meadow Creek* was "high enough in the hierarchy of the United Mine Workers of America" to render the union liable for acts done under his "leadership", 263 F.2d at 63.

We think the District Court correctly applied the plain language of Section 6, 29 U.S.C. § 106, which specifically quires "clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof".

In the absence of such proof, Congress has seen fit to remove such activities from the usual rules of agency or *respondeat superior.* Finally, we cannot say that the District Court findings of "no nexus" are clearly erroneous.

It follows that the judgment of the District Court, on both direct and cross appeals, will be affirmed.

Affirmed.