530 A.2d 853

Ronald and Frances GAJKOWSKI, Robert Schipske, and William and Jean Abate, Appellants,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA and Highway Truck Drivers and Helpers Local Union No. 107, Appellees.

Supreme Court of Pennsylvania.

Argued April 8, 1987.

Decided Aug. 31, 1987.

Application for Reconsideration Granted Nov. 18, 1987.

Gregory T. Magarity, Philadelphia, for appellants.

Thomas W. Jennings, William J. Einhorn, Philadelphia, for appellees.

Richard Markowitz, R. David Walk, Philadelphia, for amicus—Confederation of Teamsters.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

HUTCHINSON, Justice.

Ronald and Frances Gajkowski, Robert Schipske and William and Jean Abate (appellants) appeal by allowance a Superior Court order 350 Pa.Super. 285, 504 A.2d 840 which reversed an order of an *en banc* panel of Bucks County Common Pleas. Appellants brought suit in Common Pleas against appellees, International Brotherhood of Teamsters,

Chauffeurs, Warehousemen and Helpers of America (IBT) and Highway Truck Drivers and Helpers Local Union No. 107 (Local 107), for damages stemming from a shooting on January 25, 1980 at a plant at which members of Local 107 were on strike and picketing. A jury returned a verdict in favor of appellants. An *en banc* panel of Bucks County Common Pleas affirmed. Concluding that there was insufficient evidence to warrant holding the appellees liable, Superior Court reversed. Our examination of the record leads us to hold that Superior Court properly exonerated the IBT from liability. However, there is sufficient evidence from which the jury could properly hold Local 107 liable for damages resulting from the shooting. Therefore, we affirm that portion of Superior Court's order relating to IBT and reverse the order relieving Local 107 of liability.

On November 18, 1979, the members of Local 107 employed at the Minnesota Mining and Manufacturing Company's (3M) Bristol plant voted to commence a lawful economic strike after rejecting 3M's final offer for a new collective bargaining agreement. After the strike vote, Local 107 initiated around-the-clock picketing at the entrance to the Bristol facility. The picketing remained uneventful until January 25, 1980, when Robert Ballinger, a member of Local 107, shot Ronald Gajkowski, Robert Schipske and William Abate with a .22 caliber revolver.[1] Gajkowski and Schipske were members of Local 107 and Abate was a security guard at the 3M plant. As a result of the shooting, Gajkowski lost his left eye, Schipske suffered injuries to his nose and Abate sustained severe internal injuries.

Appellants filed a complaint in trespass in Bucks County Common Pleas against Local 107 and its parent organization, the IBT. Following a lengthy trial, the jury was instructed on common law negligence principles and the stricter proof requirements incorporated in Pennsylvania's Labor Anti-Injunction Act. Although Common Pleas held that the act's strict limitations on union liability for civil

---

1. At trial, Ballinger denied any responsibility for the shooting although he admitted to police at the scene that he in fact was the perpetrator and later pled *nolo contendre* to the criminal charges.

damages did not apply to the facts of this case, the jury was presented with special interrogatories on both theories of liability. The jury found in favor of the appellants on both theories and awarded damages totaling approximately 1.3 million dollars.[2] Common Pleas, sitting *en banc*, denied appellees' post-trial motions seeking arrest of judgment, judgment *non obstante verdicto* or a new trial. Holding that the Labor Anti-Injunction Act applies, Superior Court determined that the appellants offered insufficient evidence to support the verdicts and entered judgment n.o.v. We granted appellants' petition for allowance of appeal because of the important questions raised on union liability under this act for injuries arising out of violence during strikes.

## I. INTRODUCTION

Section 8 of Pennsylvania's Labor Anti-Injunction Act, Act of June 2, 1937, P.L. 1198, No. 308, 43 P.S. § 206h (Anti-Injunction Act), sets out both the kind and degree of proof necessary to hold a labor organization liable for the acts of officers, members or agents:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute as herein defined, shall be held responsible or liable in any civil action at law or suit in equity or in any criminal prosecution for the unlawful acts of individual officers, members or agents, except upon proof beyond a reasonable doubt in criminal cases, and by the weight of evidence in other cases, and without the aid of any presumptions of law or fact, both of—(a) the doing of such acts by persons who are officers, members or agents of any such association or organization; and (b) actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof by such association or organization.

2. The jury apportioned the damage award as follows: Ronald Gajkowski, $589,960; Frances Gajkowski, $62,500 (loss of consortium); Robert Schipske, $12,000; William Abate, $540,000; and Jean Abate, $100,000 (loss of consortium).

43 P.S. § 206h. Arising from the troubled labor history which precedes the Great Depression, the act reflects a legislative decision that crippling judgments against labor organizations in unfriendly forums threaten workers' rights to collective bargaining. Anti-Injunction Act, *supra,* § 2, 43 P.S. § 206b(a). *See also Western Pennsylvania Hospital v. Lichliter,* 340 Pa. 382, 387, 17 A.2d 206, 209 (1941). The Pennsylvania statute closely parallels the language of Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106 (1982), which reflects the same concern.[3] In *Philadelphia Marine Trade Ass'n v. International Longshoremen's Ass'n,* 453 Pa. 43, 308 A.2d 98 (1973), noting the similarities in the two statutes, we stated that the United States Supreme Court's interpretation of Section 6 of the Norris-La-Guardia Act offers guidance in our construction of Section 8 of the Anti-Injunction Act. Examination of the myriad of opinions of other state and federal courts in this area also offers insight into the competing policy considerations in this area of labor relations.[4]

The background of Section 6 of the Norris-LaGuardia Act was explored in *United Brotherhood of Carpenters v. United States,* 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947). There, the Court held that the unique language of the Norris-LaGuardia Act precludes the employment of either standard agency or *respondeat superior* analysis to hold a union vicariously liable for the torts of its officers, members and agents:

**3.** That section reads:
No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.
29 U.S.C. § 106.

**4.** The United States Supreme Court has long held that the state courts have jurisdiction over labor matters involving violence and threats to public order. *See, e.g., United Constr. Workers v. Laburnum Constr. Corp.,* 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954) (state court not precluded from determining common law tort based on threats of violence and intimidation).

We hold, therefore, that "authorization" as used in § 6 means something different from corporate criminal responsibility for the acts of officers and agents in the course or scope of employment. We are of the opinion that the requirement of "authorization" restricts the responsibility or liability in labor disputes of employer or employee associations, organizations or their members for unlawful acts of the officers or members of those associations or organizations, although such officers or members are acting within the scope of their general authority as such officers or members, to those associations, organizations or their officers or members who actually participate in the unlawful acts, except upon clear proof that the particular act charged, or acts generally of that type and quality, had been expressly authorized, or necessarily followed from a granted authority, by the association or non-participating member sought to be charged or was subsequently ratified by such association, organization or member after actual knowledge of its occurrence.

*Id.* at 406–407, 67 S.Ct. at 781 (footnote omitted). Following *United Brotherhood of Carpenters,* Congress provided a right of action for money damages in certain labor disputes in Section 303(b) of the Labor Management Relations Act, 29 U.S.C. § 187(b) (1982).[5] In *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Court compared Section 303(b) of the Labor Management Relations Act with Section 6 of the Norris-LaGuardia Act and stated that "the responsibility of a union for the acts of its members and officers [under § 303] is to be measured by reference to ordinary doctrines of agency,

**5.** 29 U.S.C. § 187(b) states:

(b) Whoever shall be injured in his business or property by reason or any violation of subsection (a) [relating to unfair labor practices by a labor organization] of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

rather than the more stringent standards of § 6 [of the Norris-LaGuardia Act]." *Id.* at 736, 86 S.Ct. at 1144. Thus, it is clear that both Section 6 of the Norris-LaGuardia Act and Section 8 of the Pennsylvania Anti-Injunction Act require a higher showing than the common law rules of agency. *See Dow Chemical Co. v. International Union of Elec., Radio & Mach. Workers,* 480 F.2d 433, 437 (5th Cir.1973), *cert. denied,* 415 U.S. 932, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974); Note, *Union Responsibility for Acts of Officers and Members,* 63 Harv.L.Rev. 1035, 1039 (1950).[6]

■ In an effort to avoid the difficult proof requirements of Section 8, appellants proffer two arguments, neither of which is persuasive. First, appellants contend, and Common Pleas agreed, that the legislature, through the adoption of Section 8, did not intend to supplant common law agency principles in personal injury matters. They argue that the statute was designed to protect unions solely from suits for economic damages stemming from a labor dispute.

We do not agree. Protecting unions from damage awards which would impinge upon the collective rights of workers is the clear import of Section 8. *Supra* at 855. The protection is available regardless of the theory that the plaintiff pursues. The purpose of this section's higher standard of proof in civil actions is the protection of the worker's right to collective bargaining without exposing his union to the higher costs engendered by the agency notion of *respondeat superior.* Since the union generally has no pool of profits with which to withstand the impact of unanticipated and costly damage awards, it could well be destroyed by an inadequately established claim.

**6.** *See generally* Note, *Labor Unions—Vicarious Liability for Torts Committed by Members,* 57 Wash.L.Rev. 193 (1981); Comment, *The Liability of Labor Unions for Picket Line Assaults,* 21 UCLA L.Rev. 600 (1973); Note, *Tort Liability of Labor Unions for Picket Line Assaults,* 10 U.Mich.J.L.Ref. 517 (1977); Annotation, *Liability of Labor Union or its Membership for Torts Committed by Officers, Members, Pickets, or Others, in Connection with Lawful Primary Labor Activities,* 36 A.L. R.3d 405 (1971).

Second, appellants argue that Section 4 of the act serves to remove all acts of violence from the strictures of the Anti-Injunction Act. Since their cause of action is predicated upon a series of violent acts, they contend, the unique proof requirements of Section 8 do not apply. Section 4(d) of the act states:

No court of this Commonwealth shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case included within this act, except in strict conformity with the provisions of this act, nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this act. Exclusive jurisdiction and power to hear and determine all actions and suits coming under the provisions of this act, shall be vested in the courts of common pleas of the several counties of this Commonwealth: Provided, however, That this act shall not apply in any case—

. . . . .

(d) Where in the course of a labor dispute as herein defined, an employe, or employes acting in concert, or a labor organization, or the members, officers, agents, or representatives of a labor organization or anyone acting for such organization, seize, hold, damage, or destroy the plant, equipment, machinery, or other property of the employer with the intention of compelling the employer to accede to any demands, conditions, or terms of employment, or for collective bargaining.

43 P.S. § 206d(d). Appellants argue that the language "this act shall not apply in any case," coupled with the prohibition against violence in Section 4(d), 43 P.S. § 206d(d), prevents the use of Section 8 of the Act in cases involving violent acts. Careful scrutiny of Section 4, 43 P.S. § 206d, reveals that subsections (a) through (d) were added to the Act of June 2, 1937, P.L. 1198, No. 308, by the Act of June 9, 1939, P.L. 302, No. 163. Prior to that amendment, Section 4 concluded with the word "Commonwealth" immediately before the proviso. Subsection (d) was

added to restore to a chancellor the power to enjoin a violent labor dispute. The subsection does not abrogate the protections afforded in Section 8 which apply to any organization or association "in any civil action at law or suit in equity." Anti-Injunction Act, *supra*, § 8, 43 P.S. § 206h. It does not apply to actions at law for damages. An injunction poses no threat to the viability of a labor organization whereas damage awards may quickly strangle the entity responsible for bargaining on behalf of workers. Hence, in amending the original act in 1939, the legislature retained the original higher standard of proof for damage actions. The 1939 amendment was intended to insure that an injunction will quickly issue when required to calm a heated and violent labor dispute. *Link Belt Co. v. Local 118 American Federation of Technical Eng'rs*, 415 Pa. 122, 202 A.2d 314 (1964). Regarding the limited impact of the 1939 amendments, we stated in *Link Belt:*

> Section 4, as originally drafted, deprived our courts of jurisdiction to grant injunctions in labor disputes except as provided elsewhere in the Act. The proper and logical section for amendment to create exceptions to that limitation of jurisdiction is Section 4. *The balance of the Act remains in full effect in those situations covered by the jurisdictional section.*

*Link Belt, supra*, 415 Pa. at 128, 202 A.2d at 317 (emphasis added).

This distinction is also sound from the standpoint of policy. A union qua union can have no legitimate interest in preventing an injunction against violence on the picket line, whether or not it participated in fomenting that violence. If it did, it is properly a party. If it did not, it should support an end to the violence as all good citizens are required to do. On the other hand, a civil suit for damages against a union which did not participate or foment unlawful acts by its members can destroy or severely cripple a union which has taken no part in its members' unlawful acts. Therefore, to permit such suits without proof of actual participation strikes at the core of the act's

policy of protecting unions as entities from adverse consequences arising from acts in which they did not participate. With these general principles in mind, we now turn to the facts of the case *sub judice.*

## II. PARTICIPATION OF LOCAL 107

For a labor organization to be liable for "participation" pursuant to Section 8 of the Anti-Injunction Act, a jury must find that (1) the acts were committed by officers, members or agents of the organization and (2) the organization actually participated in the acts. Such a finding must be predicated upon clear proof. *Philadelphia Marine, supra* at 453 Pa. 52, 308 A.2d at 103 (*quoting Gibbs, supra* ). It is beyond question that the major players in this tragedy were members of Local 107. The difficult question is whether the entity itself, Local 107, "participated" in the drama and so is liable to compensate the victims. A finding of participation may be based upon circumstantial evidence. *Ritchie v. United Mine Workers,* 410 F.2d 827, 833 (6th Cir.1969). *See also James R. Snyder Co. v. Edward Rose & Sons,* 546 F.2d 206, 209 (6th Cir.1976) (proof of authorization or ratification can be based upon circumstantial evidence). In determining whether a labor organization has actually participated in the commission of an act, we hold that the number of persons involved, the status of these persons in the organization, and whether the organization was aware of and in a position to exercise control over the acts, are all relevant considerations. *See United Aircraft Corp. v. International Association of Machinists,* 161 Conn. 79, 89, 285 A.2d 330, 337 (1971), *cert. denied,* 404 U.S. 1016, 92 S.Ct. 675, 30 L.Ed.2d 663 (1972). This record shows clear proof of Local 107's participation in the sorrowful events of January 25, 1980, a participation for which it should be condemned and held accountable to those injured. Therefore, Superior Court erred in granting judgment n.o.v. in favor of the appellee, Local 107.

At this point, an exacting review of the 1,113 page trial transcript is necessary. The following people were primary

participants in this tragedy. At the time of the strike and shooting, Joseph Cimino was president of Local 107. John Smalley was a business agent/recording secretary of the Local and chief negotiator in the ongoing discussions with 3M. Mr. Smalley was, according to his own testimony, responsible for control of the picket line. N.T. February 28, 1984 at 371. William Crossan was an employee of 3M, the local union's chief steward and a member of its negotiating committee. Robert Kendig was a union steward and employee at the Bristol plant and also a member of the negotiating committee. Robert Ballinger was an employee of 3M, a member of Local 107 and the individual who fired the pistol, injuring fellow picketers Gajkowski and Schipske and 3M security guard Abate.

Although pulling the trigger was the physical act of one intoxicated picketer, there is sufficient evidence from which the jury could properly hold that Local 107 participated in the calamity of January 25. On that fateful day, Crossan, Kendig, Ballinger and two others went to the "Tulleytown Tank" for lunch. Crossan stated that the men "drank continuously" for a couple of hours. *Id.* at 424. Upon their return to the line, Crossan and Kendig began handing out leaflets to non-striking employees. *Id.* at 425. 3M security supervisor Joseph Boxmeyer asked Crossan and Kendig to stop doing this on 3M's property. N.T. February 29, 1984 at 79–81. Kendig went on to let air out of the tires of cars on the 3M lot. N.T. February 28, 1984 at 429; February 29, 1984 at 81. Later, Crossan and Kendig left in Kendig's truck, ostensibly to check on Kendig's children. Before leaving, a striker overheard Kendig remark that he was going to get a gun to shoot out 3M's lights and security camera. N.T. February 28, 1984 at 195. At Kendig's house, both Crossan and Kendig had a shot of alcohol before coming back to the line. While they were riding back to the plant, Kendig showed Crossan a gun he was storing in the truck. Crossan made no objection to Kendig's bringing the gun on the line. N.T. February 28, 1984 at 432–434.

Kendig took the gun into the strike trailer across the street from 3M's property. Strikers were assembled in the trailer playing cards. Kendig displayed the gun to all present and exclaimed "deal me in." N.T. February 27, 1984 at 121. At this, Kendig laughed and left the trailer. *Id.* at 122. The record is filled with evidence that large amounts of alcohol were consumed on the line that evening. *Id.* at 110, 113, 115; February 28, 1984 at 175, 177. Ballinger, who would later fire the injurious shots, was described by a number of witnesses as drunk. N.T. February 27, 1984 at 118; February 28, 1984 at 182. Soon, rocks and bottles were being thrown at the plant. N.T. February 27, 1984 at 126. Two witnesses credited Kendig with throwing the first bottle and shouting, "This will get something started." *Id.*; N.T. February 28, 1984 at 292. George Cook, the picket line captain, testified that he had been drinking and took part in throwing the rocks and bottles. N.T. February 28, 1984 at 275–76. One bottle went astray and hit Ballinger on the head. N.T. February 27, 1984 at 128; February 28, 1984 at 252.

The once peaceful picket line deteriorated into a raucous mob. One witness described the growing tension and two witnesses characterized the situation as "rowdy." N.T. February 27, 1984 at 130; February 28, 1984 at 190. Joseph Boxmeyer, 3M's security head, noted in his log that the picketers were attempting to create a confrontation through their actions. N.T. February 29, 1984 at 85; Plaintiffs' Exhibit No. 59. Some time after 7:00 P.M., one picketer and an employee of 3M reported shots. N.T. February 27, 1984 at 134; Plaintiffs' Exhibit No. 36. Crossan then met Kendig near the gas station across the street from the plant; Kendig handed Crossan the pistol and urged Crossan to shoot out the lights at the plant. Crossan replied, "I don't know how." Kendig offered to instruct him; Crossan decided to go to the men's room. N.T. February 28, 1984 at 434–35. He admitted that he did not attempt to restrain Kendig or contact Smalley. *Id.* at 436. After Crossan departed, Kendig met up with Ballinger and

Ballinger fired the shots from Kendig's gun which injured appellants.

Jack Smalley, business agent for Local 107, testified that he was responsible for the conduct of the strike at the Bristol 3M plant. N.T. February 28, 1984 at 371. He asserted that Local 107 had a rule against drinking alcoholic beverages on the picket line. *Id.* at 376, 379. At least four witnesses testified there was no such rule. N.T. February 27, 1984 at 110; February 28, 1984 at 236, 241, 273. Smalley stated that he was aware of drinking on the line but admitted he took no steps to curb it. *Id.* at 388–390. George Cook testified that on one occasion he observed George Massimini, another business agent of Local 107, delivering alcoholic beverages to the strikers. *Id.* at 279–80.

This record reveals a dangerous combination of escalating tensions, alcohol and firearms. The firing of the pistol at the three victims was not the act of a lone perpetrator but the end result of a collective assault on the 3M plant. The passing of the weapon among union officials responsible for the negotiating process is sufficient to hold Local 107 liable as a participant. *See, e.g., Charles D. Bonanno Linen Service v. McCarthy,* 708 F.2d 1, 11–12 (1st Cir.1983) (imposition of liability on union where union representative, vested with authority to control violence, failed to act), *cert. denied,* 464 U.S. 936, 104 S.Ct. 346, 78 L.Ed.2d 312 (1983). *See also NLRB v. Brewery and Beer Distrib. Drivers,* 281 F.2d 319, 321–22 (3d Cir.1960) (court deems authority of stewards comparable to that of factory foremen); Evans, *The Law of Agency and the National Union,* 49 Ky.L.J. 295, 314 (1961) (discusses authority of stewards as bottom link in chain of union command). The record shows that many strikers, with varying degrees of authority, were aware of the pistol on the line.[7] No one used his authority

7. Appellees' argument, that the stewards enjoyed no real authority with the expiration of the collective agreement, is specious. Even assuming *arguendo* that the stewards' authority ended with the expiration of the contract, these stewards, Crossan and Kendig, assumed

to remove it or stop the drinking. Business agent Smalley's failure to do anything is not only a failure of personal responsibility but a failure by the union which gave him that responsibility. From it, the jury could properly infer the "knowing tolerance" of violence held actionable under the Norris-LaGuardia Act by the United States Supreme Court in *Gibbs, supra* 383 U.S. at 739, 86 S.Ct. at 1145–46. Knowing tolerance finds no greater excuse in Pennsylvania. Our legislature did not intend Section 8 of the Pennsylvania Labor Anti-Injunction Act to countenance total abdication of union responsibility for deadly violence in tense labor situations. There is a time when those who have accepted responsibility from their fellow workers for advancing the collective good cannot look the other way while irresponsible men openly foment violence which injures people and hauls the labor movement into disrepute.

This record also includes circumstantial evidence that Joseph Cimino, president of Local 107, sanctioned the assault on the Bristol plant. Three days prior to the events of January 25, Cimino attended a meeting at the Washington, D.C. office of the IBT to discuss a number of unresolved issues. Present were Cimino, Norman Weintraub, an IBT economist, Joseph Cotter, an IBT staff employee, Nelson Schmidt, a 3M attorney, and Robert Hanson, a 3M personnel manager. At the conclusion of the meeting, Cimino and Hanson agreed to re-evaluate their positions during a follow-up phone call. Mr. Hanson's notes, introduced into evidence by stipulation, reveal the content of his conversation with Cimino on January 25, the day of the melee:

Joe Cimino called me answering my call to Cotter. Summary of conversation: We need all 13 items I gave you yesterday. People are adamant and strong. I've spent a lot of time on picket line. They won't go back to work for a few cents. I've got to represent them. We're going to extend our picketing. I've got approval from the Intl. *We're going to do what we have to do—it's*

new authority as members of the negotiating committee bargaining on behalf of the striking employees.

*been peaceful for ten weeks—it's getting hot now—they are uptight—we've got to get mgmt's attention.* I have no malice—I won't lie to you or sandbag you. These people don't like being 2nd class citizens—they compare rates and benefits with St. Paul, and other three plants & don't like being behind. Everybody has sick days these days. You get injunction & then tell us where you're shipping all boxcars—it's written on cars "To Anchor" or "To Leno"—that's really rubbing salt in wounds. First time they're doing it. We're have a demonstration Mon. in Phil.—95% of 3M will be there and some truck drivers.

Plaintiff's Exhibit No. 28 (emphasis added).[8] The appellees contend that Mr. Cimino's statement refers to legitimate efforts to extend the picketing to other 3M facilities and a rally to be held in Philadelphia to demonstrate support for Local 107. Whether Cimino's comments refer to the violence of January 25 or to the proposed legitimate efforts to pressure 3M was for the jury to decide.

 Because Common Pleas properly instructed the jury on the applicability of the Labor Anti-Injunction Act through the use of special interrogatories, our review is limited to a determination of whether there is sufficient evidence on which to base the jury's verdict. *Burbage v. Boiler Eng'g. & Supply Co.,* 433 Pa. 319, 323, 249 A.2d 563, 566 (1969). Our system vests the responsibility of determining the facts with the jury and we will not upset their findings absent a showing that the verdict is capricious, against the weight of the evidence and resulted in a miscarriage of justice. *Simon v. H.K. Porter Co.,* 407 Pa. 359, 363, 180 A.2d 227, 229 (1962). We are particularly reluctant to disturb a verdict which is supported by both the trial court and a panel of that court sitting *en banc. Skoda v. West Penn Power Co.,* 411 Pa. 323, 338, 191 A.2d 822, 830

8. Mr. Cimino's statement is probative on the issue of whether he "participated" in the violence at the Bristol plant. The statement could also be considered as indicative of Local 107's "authorization" of the shooting. However, as circumstantial evidence, we do not believe that this statement alone is clear proof of Local 107's "authorization" of the tragic events of January 25.

(1963); *Roadman v. Bellone,* 379 Pa. 483, 491, 108 A.2d 754, 758 (1954).

Our detailed factual recital shows that there is evidence on this record sufficient for a jury to determine that enough of the membership of Local 107 and of its officers took part in the tragic events of January 25 to hold the Local liable as a participant for the appellants' damages. The principal players include stewards serving as agents on the negotiating committee, officers and a host of members of the Local. The record bespeaks rising tensions, fueled by alcoholic beverages, that reached a violent crescendo on the evening of January 25, without any responsible effort to avert it. Considering the evidence which the jury had when it held Local 107 liable, we see no reason to disturb that verdict.

### III. PARTICIPATION OF THE IBT

■ While the record is full of evidence from which the jury properly inferred the participation of Local 107 in the January 25 violence, there is no clear proof of either actual participation or actual authorization by the IBT. At trial, appellants sought to demonstrate, through the introduction of copies of the constitutions of the two organizations, that the local is the agent of the parent and therefore jointly liable for the harm. This effort to demonstrate an agency relationship was buttressed by evidence of strike benefits paid from the IBT to local members. Also, appellants proffered evidence of a parade held in Philadelphia three days after the shooting; however, there was absolutely no showing that the officers of the IBT sanctioned this event as a demonstration of support of the violence of January 25. This showing falls well short of the clear proof of actual authorization or actual participation called for in Section 8. *Cf. Riverside Coal Co. v. United Mine Workers,* 410 F.2d 267 (6th Cir.1969) (parent union's agents actually involved in violence), *cert. denied,* 396 U.S. 846, 90 S.Ct. 89, 24 L.Ed.2d 95 (1969). Indeed, this is precisely the situation in which the legislature intended to protect a union from the imposition of liability through its enactment of Section 8.

Appellants' evidence could demonstrate a common law agency relationship. This is insufficient under the statute. While fears of strangling new unions may seem to have little relevance in the context of today's large and powerful national bodies, a change from participation to *respondeat superior* as the basis for union liability is a decision for the legislature, not the courts.

The day-to-day functions of a labor organization will not evidence liability for tortious conduct. For example, a number of courts have held that the payment of routine strike benefits alone does not give rise to liability under Section 6 of the Norris-LaGuardia Act. *Gibbs, supra* 383 U.S. at 738, 86 S.Ct. at 1145; *Federal Prescription Serv. v. Amalgamated Meat Cutters,* 527 F.2d 269, 276–77 (8th Cir.1975). Absent a showing that the IBT took affirmative steps to either sanction or take part in the events of January 25, Superior Court properly exonerated the organization from any liability.

Based on the foregoing, the order of Superior Court is reversed with regard to Local 107. It is otherwise affirmed.

PAPADAKOS, J., joins in this opinion and files a concurring opinion.

LARSEN, J., files a concurring and dissenting opinion.

ZAPPALA, J., files a concurring and dissenting opinion in which NIX, C.J., joins.

PAPADAKOS, Justice, concurring.

I join with the Majority, but write separately to express my deep concern over the lack of any challenge to the awards for loss of consortium. Frances Gajkowski was awarded $62,500.00 for the temporary loss of her mate's sexual favors and for a temporary diminishment in the society and services he rendered her. Jean Abate was awarded $100,000.00 for the same temporary losses. I do not understand why defendants would stand mute before the appellate courts on these matters. Perhaps they know

more than the record reflects. In any event, I decry the fact that this matter cannot be reached by the Court.

LARSEN, Justice, concurring and dissenting.

I agree with the majority that the evidence falls well short of the required proof of actual participation in or authorization of the tragic events of January 25, 1980 on the part of appellee, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (IBT). Accordingly, I concur in affirming the order of the Superior Court absolving IBF from any liability.

I, however, dissent to the majority's finding that "there is sufficient evidence from which the jury could properly hold that [appellee, Highway Truck Drivers and Helpers Local Union No. 107] participated in the calamity of January 25." (Opinion, p. 858.) There is no dispute that the quality of proof required to hold a labor organization, in this case Local 107, liable for the acts of its officers, members or agents is governed by Section 8 of the Pennsylvania Labor Anti-Injunction Act of June 2, 1937, P.L. 1198, No. 308, 43 P.S. § 206h (Anti-Injunction Act). Section 206h of the controlling Act provides:

No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute as herein defined, shall be held responsible or liable in any civil action at law or suit in equity or in any criminal prosecution for the unlawful acts of individual officers, members or agents, except upon proof beyond a reasonable doubt in criminal cases, and by the weight of evidence in other cases, and without the aid of any presumptions of law or fact, both of (a) the doing of such acts by persons who are officers, members or agents of any such association or organization; and (b) actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof by such association or organization. 1937, June 2, P.L. 1198, § 8.

The majority correctly observes that in *Philadelphia Marine Trade Association v. International Longshoremen's Association*, 453 Pa. 43, 308 A.2d 98 (1973) we noted that Section 206h of the Anti-Injunction Act is patterned after § 6 of the Norris-LaGuardia Act, 47 Stat. 71, 29 U.S.C. § 106 which provides as follows:

> No officer or member of any association or organization and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

Mar. 23, 1932, c. 90 § 6, 47 Stat. 71, 29 U.S.C. § 106. In *Philadelphia Marine Trade Association* we stated:

> As the United States Supreme Court said in discussing that section in its opinion in the case of *United Mine Workers of America v. Gibbs*, 383 U.S. 715 [86 S.Ct. 1130, 16 L.Ed.2d 218] (1966), quoting its opinion in *Brotherhood of Carpenters v. U.S.*, 330 U.S. 395, 403 [67 S.Ct. 775, 780, 91 L.Ed. 973] (1947): "... whether § 6 should be called a rule of evidence or one that changes the substantive law of agency ... its purpose and effect was to relieve organizations ... and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization, without clear proof that the organization or member charged with responsibility for the offense actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."
>
> We believe that § 206h of the Pennsylvania Labor Anti-Injunction Act was intended to have the same purpose as § 6 of the Norris-LaGuardia Act.

*Id.*, 453 Pa. at 52, 308 A.2d at 103.

The majority in holding there is clear proof that Local 107 participated in the dire events of January 25, 1980, points to

the following evidence: (a) that William Crossan, Robert Kendig and Robert Ballinger along with two other strikers were at lunch that day for two hours and during that time they "drank continuously"; (b) that Kendig let air out of automobile tires in the 3M parking lot; (c) that Kendig and Crossan went to Kendig's home to check on his children and while there Kendig got a gun to bring back to the picket line; (d) that Crossan did not object to Kendig bringing the firearm on the picket line; (e) that Kendig was a shop steward; (f) that Crossan was a chief steward; (g) that alcoholic beverages were consumed in some quantity on the picket line that day; and, (h) that George Massimini, a union business agent, was seen delivering alcoholic beverages to the strikers on the picket line.

Although these activities are objectionable and inconsistent with sensible picket line conduct, they hardly constitute "clear proof" that Local 107 participated in or authorized the deplorable gunfire that injured the appellants. The shooting on January 25, 1980 was an isolated act of two members of the local union (Ballinger and Kendig) which occurred after ten consecutive weeks of peaceful and lawful picketing. To hold that there is "clear proof" that Local 107 participated in this senseless shooting, as the majority does, is to torture the evidentiary standard of Section 206h. I would affirm the entire order of the Superior Court.

ZAPPALA, Justice, concurring and dissenting.

As does Justice Larsen, I agree with the majority that the evidence is insufficient to establish liability of IBT, but depart from its holding that there was sufficient evidence from which the jury could find Local 107 liable for damages arising from the shooting. Although the majority concludes that Section 8 of the Pennsylvania Anti-Injunction Act requires a greater burden of proof than that required under the common law rules of agency to establish the liability of a union for the acts of its members and officers, it quickly abandons this requirement on the particular facts of the case.

The majority heavily emphasizes the status of William Crossan and Robert Kendig as union stewards and members of the negotiating committee, and their involvement in the shooting incident, in arriving at its conclusion that the evidence was sufficient to hold Local 107 liable as a participant. The uncontroverted evidence repudiates the majority's implication that the status of these two individuals as stewards and negotiating committee members was such that their conduct could be sufficient to establish that Local 107 actually participated in the acts. Neither of these positions vested authority in those individuals to control the picket line; yet, the majority presumes such authority existed, stating "No one used his authority to remove [the pistol] or stop the drinking." [Majority Opinion at 17.] Contrary to the expansive responsibilities imagined by the majority to exist in one who held those positions, a steward's only responsibility was the processing of grievances. R. 461a, 475a. This function had significance only as long as the collective bargaining agreement was in effect.

In order to perfect its premise, the majority finds that Crossan and Kendig, as members of the negotiating committee, were imbued with "new authority". This finding is the entire underpinning of the majority's theory of liability as it relates to Local 107. Without evidence that Crossan and Kendig were responsible for supervising the conduct of the striking workers while on the picket line, their actions are not a proper predicate for establishing liability of Local 107. The record demonstrates that as members of the negotiating committee, Crossan and Kendig simply acted as sources of information relative to the progress of the negotiations. R. 447a, 476a. No actual participation in the violence, or authorization, by the union is established simply by showing that members who happened to be on the negotiating committee were involved in acts of violence.

The acknowledged purpose of the higher standard of proof required in this particular type of litigation is to protect the workers' right to collective bargaining without exposing the union to greater costs resulting from the

application of an agency concept of respondent superior. The majority lauds the purpose, only to defeat it by misrepresenting the import of the cases on which it relies. It seizes on isolated phrases without any reference to the context in which they were originally used. This is especially disingenuous where the language now given *broader* application by this indiscriminate use was first employed to demonstrate the *more stringent* proof requirements of the legislation.

This is demonstrated by the majority's reliance on *Charles D. Bonanno Linen Service v. McCarthy,* 708 F.2d 1 (1st Cir.1983), *cert. denied,* 464 U.S. 936, 104 S.Ct. 346, 78 L.Ed.2d 312 (1983), and *NLRB v. Brewery and Beer Distrib. Drivers,* 281 F.2d 319 (3rd Cir.1960) to bolster its finding of liability. The majority's reliance on *Brewery and Beer Distrib. Drivers* is unpersuasive because the court noted therein that the record was devoid of any evidence to establish the scope of authority the stewards had in representing the union and that no constitution or by-laws of the union defining such authority were submitted into evidence. That court premised its finding that the stewards had acted within the scope of their authority on clear evidence demonstrating a course of conduct.[1] Different individuals holding the office of steward at various places of business had engaged in similar conduct. In the instant case, the evidence was undisputed that the responsibility of the stewards was limited to representing union members in grievance proceedings. No course of conduct similar to that in *Brewery and Beer Distrib. Drivers* was established.

Following its statement that "[t]he passing of the weapon among *union officials responsible for the negotiating process* is sufficient to hold Local 107 liable as a participant." (emphasis added), the majority cites to *Bonanno* for the proposition that liability could be imposed where a union representative with authority to control violence, failed to

1. It was found that its stewards had encouraged employees of neutral distributors not to load beer orders of members of the complaining association unless they had entered into an agreement made between the union and another distributors association.

act. However, *Bonanno* reinforces only one premise of the majority's syllogism. The deficiency of the majority's logic is that the facts in this case do not support the same premise. In *Bonanno*, there was an indisputable breach of responsibility to control violence. When the company had first requested an injunction against the union, its representative "promised the court he would control the pickets", *Id.* at 11, and the court refused the injunction. After the violence, a restraining order was issued on the court's finding that the representative who had the power and authority to control the violence had deliberately failed to deliver on his promise. Indeed, in an earlier opinion in the case the court noted that the representative had given approval for one of those subsequent acts of violence. *Charles D. Bonanno Linen Service, Inc. v. McCarthy*, 532 F.2d 189, 191 (1st Cir.1976).

*Bonanno* does not provide proper support for the majority's leap from the statement that the union officials were involved in the negotiating process to the conclusion that they had the power and authority to control the picket line. Although the court in *Bonanno* made this point, it did so by taking out of context a statement by the Supreme Court in the seminal case interpreting the Norris-LaGuardia Act, *United Brotherhood of Carpenters v. United States*, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947). The Court did say that "[t]he grant of authority to an officer of a union to negotiate agreements with employers ... may well be sufficient to make the union liable." *Id.* at 410, 67 S.Ct. at 783. The illegal act for which the union was sought to be held criminally liable in that case, however, was entering into a contract that violated the Sherman Act. If the purpose of the more stringent proof required by the act is to protect "unions as entities from adverse consequences arising from acts in which they did not participate," Majority Opinion at 11, there is nothing unusual in finding union participation in an antitrust violation where its representative, with authority to enter a contract, entered a contract that was in fact illegal. "[T]he particular act charged, or acts generally of that type and quality, had been expressly authorized, or

necessarily followed from a granted authority." *Id.* at 406–07, 67 S.Ct. at 781. The entire stated purpose is defeated, however, if it can be assumed, as the majority does here, that a member given authority to negotiate on behalf of strikers thereby has control over all acts of the strikers and bears responsibility for them.

A final egregious example is the reference to *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The majority refers to the business agent's overall responsibility for the control of the picket line and states that from his failure to act "the jury could properly infer the 'knowing tolerance' of violence held actionable under the Norris-LaGuardia Act ... in *Gibbs.*" The majority leaves the inference that business agent Smalley was present at the picket line and aware of the presence of the gun, but the record demonstrates that he was not. This point is significant in understanding the misuse of the phrase "knowing tolerance" taken from *Gibbs.*

In *Gibbs*, a dispute between a UMW local and a rival union over the organizing of a coal mine being newly opened had resulted in threats to Gibbs, a mine supervisor, and the beating of an organizer for the rival union by armed members of the UMW local. The UMW international union sent a representative, who established a limited picket line at the mine and instructed against further violence. The picket line remained for nine months without incident, and the mine was never opened.

Gibbs, who also had a contract to haul coal from the mine, lost his job as superintendent and, obviously, was never able to perform on his haulage contract. He sued the local and the international unions alleging that their conduct constituted secondary boycotts in violation of § 303 of the Labor-Management Relations Act, along with other state law claims, causing these injuries to his business. The only claim found to be supported by the evidence or cognizable by the federal court was the state law claim for interference with the employment relationship. Awards against the local and international unions were affirmed by

the Circuit Court, and only the international was a petitioner in the matter before the Supreme Court.

The Court first made the point that the international could not be said to have ratified the threats and violence that had occurred merely by involving itself in the dispute on the side of the Local after the fact. It was in the context of establishing this point that the Court used the phrase "knowing tolerance". Specifically, the Court stated

[w]hat is required is proof, either that the union approved the violence which occurred, or that it participated actively or by knowing tolerance in *further acts* which were in themselves actionable under state law or intentionally drew upon the previous violence for their force.

383 U.S. at 739, 86 S.Ct. at 1146 (emphasis added). The Court gave clear indication of the meaning of this passage when it later stated that "[t]he relevant question ... is whether ... UMW representatives were clearly shown to have endorsed violence or threats of violence as a means of settling the dispute. *Id.* at 741, 86 S.Ct. at 1147.

In this case, we see a single act of violence, clearly without purpose in regard to the labor dispute (two of the three persons injured were striking workers and the third was a security guard whose continued work gave neither advantage nor disadvantage to the company or the union in the contract negotiations). Both before and after the incident the picket line was peaceful. It is beyond my comprehension how it can be said that a Local 107 business agent, who was not present at the scene, (and through him the union Local) can be said to have "knowingly tolerated" the presence of the gun, let alone the violence. He neither knew of it, nor tolerated it.

By misrepresenting the facts and distorting the law, the majority destroys the legislation's salutary purpose—the protection of employees' power to bargain collectively. From this, I must dissent.

NIX, C.J., joins in this concurring and dissenting opinion.