548 A.2d 533

**Ronald and Frances GAJKOWSKI, Robert Schipske, and William and Jean Abate, Appellants,**

**v.**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA and Highway Truck Drivers and Helpers Local Union No. 107, Appellees.**

Supreme Court of Pennsylvania.

Reargued April 12, 1988.

Decided Sept. 28, 1988.

322

Gregory T. Magarity, Philadelphia, for appellants.

Thomas W. Jennings, William J. Einhorn, Albert A. Ciardi, Jr., Philadelphia, for appellees.

Louis B. Kushner, Pittsburgh, for amicus—Team. Joint Council No. 40 of Pittsburgh.

Richard Markowitz, R. David Walk, Philadelphia, for amicus—Pa. Conference of Teamsters.

Jerome H. Gerber, Irwin W. Aronson, Harrisburg, for amicus—Pa. AFL-CIO.

Bernard N. Katz, Philadelphia, for amicus—Philadelphia Bldg. & Const. Trades Council.

Alaine S. Williams, Philadelphia, for amicus—Council 13, etc.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and STOUT, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

PAPADAKOS, Justice.

When the case was first decided on the majority opinion of Mr. Justice Hutchinson, I was a member of the 4-3 majority which held the local union accountable in damages for serious injuries inflicted upon the plaintiffs on the strike line. I joined the opinion which coincided with my view of negligence law which provides protection to those injured from tortfeasors under basic common law principles.

The repeated requests for reconsideration eventually awakened me to the realization that the Hutchinson opinion was not merely an effort to recompense injured parties for their injuries (an effort I fully support) but, rather, intentional or not, the opinion was in effect a repudiation of legislative intent and a removal of the limited liability which the Pennsylvania Labor Anti-Injunction Act was intended to cloak labor unions with in furtherance of the legislative policy of protecting the labor movement.

Thus, I joined in the granting of the Petition for Reargument Nunc Pro Tunc, inspite of the fact that a Petition for Reargument had previously been denied and that this second petition was filed late.

The grant of the Petition for Reargument Nunc Pro Tunc should shock no one as being a flagrant or unusual disregard of the rules of this Court. This Court has acted often on late petitions, even *sua sponte*, to reconsider decisions and correct grievous errors that have far-reaching consequences.

Following the entry of an order or judgment disposing of an appeal, the general procedure is to permit applications for reargument for a fourteen day period. The time period is measured from the entry of the order or judgment

involved. See, Pa.R.A.P. 2542(a). There have been times, however, when the Court has entertained petitions filed after the expiration of the fourteen day period and for reasons of fairness has granted these petitions and ordered reargument.

In *Winn v. TWA*, 506 Pa. 138, 484 A.2d 392 (1984), the Court entered its initial decision on November 29, 1984. *After the expiration* of the fourteen day reargument period expired, an application for enlargement of time was filed (on December 17, 1984) and was *granted* by the Court on January 28, 1985. On January 30, 1985, an application for reargument was filed and granted on March 25, 1985.

In *In re: Estate of Ciaffoni*, 498 Pa. 267, 446 A.2d 225 (1982), the Court issued its initial decision on April 30, 1980, and denied reargument on June 16, 1980. (491 Pa. 46, 417 A.2d 1136 (1980.)) After a final judgment had been entered in the matter, the losing party returned to the trial court and filed a Motion for New Trial Nunc Pro Tunc. This motion was denied and a second appeal was filed with this Court. The Court treated the matter as a second application for reargument under Pa.R.A.P. 105(a) and granted the petition and remanded for a new trial.

In *Commonwealth v. Blair*, 470 Pa. 598, 369 A.2d 1153 (1977), the Court disposed of a direct appeal on October 3, 1975 (463 Pa. 383, 344 A.2d 884 (1975)), and one year later, on October 19, 1976, granted a petition for reargument nunc pro tunc.

In *Lusky v. Steffron, Inc.*, 469 Pa. 377, 366 A.2d 223 (1976), the Court issued its initial opinion on April 17, 1975. After the time had expired for a petition for reargument (on May 15, 1975), the losing party filed a Petition for Clarification which was granted and the matter was reargued.

In *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973), the Court filed an opinion on January 19, 1973 and denied a petition for reargument on February 23, 1973, and then *sua sponte* reconsidered its denial order and vacated same thereby granting reargument on March 22, 1973.

In *Dozer Agency, Inc. v. Rosenberg*, 431 Pa. 321, 246 A.2d 330 (1968), the Court filed an opinion on March 22, 1966 and remanded for a re-evaluation of damages. A petition for reargument was timely filed and denied. "Sometime thereafter, this Court, *sua sponte* determined that reargument should be held limited to the question of the adequacy of the damages awarded by the court below and such reargument was held." *Dozer*, 431 Pa. at 323, 246 A.2d at 331 (1968).

For the reasons set forth below, I must repudiate my concurrence with the Hutchinson opinion, yet I cannot join with the theories supported by Mr. Chief Justice Nix and Mr. Justice Zappala. I believe that the original opinion and order dated August 31, 1987 should be withdrawn and judgment entered for the international and local union defendants.

Appellee, Highway Truck Drivers and Helpers Local Union No. 107 (Local 107) is an unincorporated association whose purpose as a labor organization is to represent employees in matters of collective bargaining with their respective employers throughout the Philadelphia Metropolitan Area. It is currently comprised of approximately 5,000 members on whose behalf it is signatory to more than 275 collective bargaining agreements with various employers throughout the Philadelphia Metropolitan area.

One of the employers with whom Local 107 has a collective bargaining agreement is the Minnesota Mining and Manufacturing Company (3M) in Bristol, Pennsylvania. Local 107 represents approximately 500 production and maintenance employees at that facility. On November 18, 1979, a majority of those employees voted by secret ballot to reject the Company's "final offer" for the terms of a new collective bargaining agreement. Local 107 commenced a lawful economic strike on the following day against the Company in support of their positions.

For the next ten weeks, approximately 500 employees continuously maintained a peaceful picket line at the Company's facility for 24 hours a day, seven days a week. On

January 25, 1980, this peace was suddenly broken by the senseless shooting and maiming of two Local 107 members and a friendly security guard (Appellants herein), all of whom were at or near the picketing site. The assailant was one Robert Ballinger, a member of Local 107, who shot the victims with a .22 caliber revolver. Ballinger later pled *nolo contendere* to criminal charges arising from the incident.

As a result of that shooting incident, Appellants filed suit against Local 107 and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (International) (IBT). The matter was tried before a jury in the Court of Common Pleas of Bucks County in February and March of 1984. That jury returned a verdict in favor of Appellants and against Appellees, Local 107 and the International, jointly and severally, in the aggregate amount of 1.3 million dollars.

Local 107 and the International thereafter timely filed post-trial motions for a judgment notwithstanding the verdict (judgment n.o.v.) or, in the alternative, for a new trial, or, in the alternative, for arrest of judgment.

On September 5, 1984, the Court of Common Pleas denied the post-trial motions filed by Local 107 and the International challenging the validity of the jury's verdict. In that same order, the court entered judgments against Local 107 and the International, jointly and severally, in the following amounts:

(a) $709,131.88 in favor of William Abate;

(b) $131,150.80 in favor of Jean Abate (for loss of consortium);

(c) $618,981.42 in favor of Ronald Gajkowski;

(d) $65,575.40 in favor of Frances Gajkowski (for loss of consortium);

(e) $12,590.46 in favor of Robert Schipske.

Thereafter, Local 107 and the International appealed to the Superior Court.

On January 28, 1986, the Superior Court issued an opinion and order in which they reversed the decision of the trial court and directed that a judgment n.o.v. be entered in favor of both Local 107 and the International. Appellants, thereafter, filed a Petition for Allowance of Appeal with this Court which was granted.

On August 31, 1987, this Court filed an opinion in this matter in which we reversed the decision of the Superior Court with regard to Local 107, but affirmed the Superior Court's decision in favor of the International.

On September 14, 1987, Local 107 timely filed with the Prothonotary of this Court an Application for Reargument which was denied on October 9, 1987.

On October 16, 1987, Local 107 filed a Voluntary Petition in Bankruptcy under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of Pennsylvania.

Thereafter, and in order to preserve their appellate rights in this matter while the bankruptcy proceedings continued, Local 107 filed with the Prothonotary of our Court, on October 22, 1987, an Application for Modification of Judgment, and on November 2, 1987, an Application for Reconsideration *Nunc Pro Tunc* of the Denial of Local 107's Application for Reargument.

On November 18, 1987, this Court issued an order granting Local 107's Application for Reconsideration *Nunc Pro Tunc* and, as a consequence, denied Local 107's Application for Modification of Judgment as moot. Oral argument was scheduled in this matter for April 12, 1988.

On March 29, 1988, the Honorable Bruce Fox, Judge of the United States Bankruptcy Court for the Eastern District of Pennsylvania, to whom Local 107's bankruptcy petition had been assigned, entered an opinion and order in which he lifted prospectively the provisions of the automatic stay set forth in 11 U.S.C. § 362(a) incident to the filing of Local 107's bankruptcy petition. The lifting of the stay was limited to Appellants and Local 107 so that the argument before this Court in this matter could occur as scheduled.

At the same time, however, Judge Fox refused to ratify the action of Local 107 in filing their original Application for Reconsideration with this Court after they had already filed the Petition in Bankruptcy on October 16, 1987.

To cure any possible violation of the automatic stay provisions of the Bankruptcy Code, Local 107, on March 31, 1988, filed with this Court an Amended Application for Reconsideration *Nunc Pro Tunc* of the Denial of Local 107's Application for Reargument. The Amended Application was granted, *per curiam,* by order dated April 7, 1988. Oral argument took place on April 12, 1988, as initially scheduled.

During the course of disposing of the merits of this appeal, it will become increasingly clear why it was decided to take the extraordinary step of reconsidering *nunc pro tunc* the original denial of Appellee's Application for Reargument.[1]

The liability of Local 107 in this case (the anticipated burden of which drove them to seek relief in federal bank-

---

**1.** Appellee's first Application for Reargument (which we denied) was timely filed. Pa.R.A.P. 2542. While Pa.R.A.P. 2547 provides that second or subsequent applications for reargument and applications for reargument which are out of time under the rules, "will not be received," our decision to allow reargument is permitted under Pa.R. A.P. 123 and 105. Rule 123 provides for the form of an application for relief where other rules do not provide an appropriate form. Rule 105 provides as follows:

**Waiver and Modification of Rules**

**(a) Liberal construction and modification of rules.** These rules shall be liberally construed to secure the just, speedy and inexpensive determination of every matter to which they are applicable. In the interest of expediting decision, or for other good cause shown, an appellate court may, except as otherwise provided by Subdivision (b) of this rule, disregard the requirements or provisions of any of these rules in a particular case on application of a party or on its own motion and may order proceedings in accordance with its direction.

**(b) Enlargement of time.** An appellate court for good cause shown may upon application enlarge the time prescribed by these rules or by its order for doing any act, or may permit an act to be done after the expiration of such time; but the court may not enlarge the time for filing a notice of appeal, a petition for allowance of appeal, a petition for permission to appeal, or a petition for review.

ruptcy court) hinges on the proper application of Section 8 of Pennsylvania's Labor Anti–Injunction Act, Act of June 2, 1937, P.L. 1198, No. 308, 43 P.S. § 206h. This Act is also sometimes referred to as a little "Norris–LaGuardia" Act. Section 8 thereof provides:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute as herein defined, shall be held responsible or liable in any civil action at law or suit in equity or in any criminal prosecution for the unlawful acts of individual officers, members or agents, except upon proof beyond a reasonable doubt in criminal cases, and by the weight of evidence in other cases, and without the aid of any presumptions of law or fact, both of—(a) the doing of such acts by persons who are officers, members or agents of any such association or organization; and (b) actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof by such association or organization.

43 P.S. § 206h.

Our statute is closely modeled on the Norris–LaGuardia Act itself, passed by Congress in 1932, Ch. 90, 47 Stat. 70 (1932) (currently at 29 U.S.C. §§ 101–115). The language of Section 8 of our Act closely parallels that of Section 6 of the federal statute, which provides as follows:

> No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

29 U.S.C. § 106.

This Court has long recognized that the purposes and content of our Act and of the federal statute closely coincide. *Philadelphia Marine Trade Association v. International Longshoremen's Association*, 453 Pa. 43, 308

A.2d 98 (1973). More specifically, the Court stated in that case that:

We believe that Section 206h of the Pennsylvania Labor Anti–Injunction Act was intended to have the same purpose as Section 6 of the Norris–LaGuardia Act.

453 Pa. at 52, 308 A.2d at 103.

What is the overriding purpose behind Section 8 (Section 206h) of our statute and Section 6 of the Norris–LaGuardia Act? It has been stated authoritatively that Section 6 of the Norris–LaGuardia Act reflects Congressional "... fear that unions might be destroyed if they would be held liable for damages done by acts beyond their practical control." *United Mine Workers v. Gibbs*, 383 U.S. 715, 737, 86 S.Ct. 1130, 1144, 16 L.Ed.2d 218 (1966).[2]

The statute's legislative history delineates the same purpose. In enacting the statute, it was noted in the U.S. Senate that:

**2.** Following World War II, Congress enacted the Labor Management Relations Act (LMRA), Ch. 120, 61 Stat. 136 (1947), 29 U.S.C. §§ 141–187, otherwise known as the famous (or infamous) Taft–Hartley Act, a piece of legislation that is distinctly anti-organized labor. The statute contained provisions that allow actions for damages to be brought in both state and federal courts for various unfair labor practices. The courts were called upon to decide how LMRA should be applied where sections of it appeared to conflict with parts of the Norris–LaGuardia Act. In *Gibbs, supra,* one point of controversy was whether § 301 of the LMRA, which provides that unions be held vicariously liable under standards of agency law, superceded Section 6 of the Norris–LaGuardia Act—the section indirectly at issue in the instant case. Mr. Justice Brennan's opinion concluded that Congress intended that Section 6 remain the applicable test in those situations not specifically within the coverage of the LMRA. In a valiant effort to save the Norris–LaGuardia Act and to coordinate and render consistent the two statutes, Mr. Justice Brennan emphasized the evidentiary aspects of Section 6, holding that the "clear proof" standard of Section 6 meant that a plaintiff must do more than meet the ordinary civil burden of persuasion. The burden is less, however, than the criminal burden of "beyond a reasonable doubt." This muddle, a result of the chilling effect of LMRA (Taft–Hartley), along with other qualifications in *Gibbs*, need not concern us, however, since we in Pennsylvania do not have our own version of Taft–Hartley that must be taken into account. We, therefore, must examine the purposes behind our own Act as it was originally written. See, Note, *Labor Unions—Vicarious Liability for Torts Committed by Members,* 57 Wash.L.Rev. 193, at 200, n. 45 (1981).

To hold that an officer or member of a labor organization, or the organization itself, should be liable for damages for unlawful acts committed while a strike is on, without clear, actual proof of authorization, participation in, or ratification of such unlawful acts, would go far towards the destruction of organized labor.

S.Rep. No. 163, 72nd Cong., 1st Sess. 19 (1932).

As was stated by the United States Supreme Court in *United Brotherhood of Carpenters v. United States*, 330 U.S. 395, 67 S.Ct. 775, 91 L.E. 973 (1947), decided before the Taft–Hartley Act entered the picture (see n. 2, *supra*):

... its [Section 6's] purpose and effect was to relieve organizations ... and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes *by some individual officer or member of the organization*, without clear proof that the organization or member charged with responsibility for the offense actually participated, gave prior authorization or ratified such acts after actual knowledge of their perpetration.

330 U.S. at 403, 67 S.Ct. at 779 (emphasis added). And in *Ramsey v. United Mine Workers*, 401 U.S. 302, 91 S.Ct. 658, 28 L.Ed.2d 64 (1971), the United States Supreme Court further described the legislative purpose underlying Section 6 of the Norris–LaGuardia Act as follows:

... the simple concern of Congress was that unions had been found liable for violence and other illegal acts occurring in labor disputes which they had never authorized or ratified and for which they should not be held responsible. Congress discerned a tendency in courts to blame unions for everything occuring during a strike.

In Part I of our original opinion in this case, we noted with approval that in *United Brotherhood of Carpenters, supra,* the Supreme Court held that the unique language of the Norris–LaGuardia Act precludes the use of *respondeat superior* or agency analysis to hold a union vicariously liable for the torts of its officers, members and agents. *"Respondeat superior,"* of course, is the classic doctrine

borne out of social policy that holds a master, an employer, an association or some other group entity (like a union) responsible for damages in a legal action for the acts or omissions of its servant, its employee, its agent or its member, even though the master, employer or group entity was not itself at fault for the harm caused.

We quoted from *United Brotherhood of Carpenters* as follows:

> We hold, therefore, that "authorization" as used in § 6 means something different from corporate criminal responsibility for the acts of officers and agents in the course or scope of employment. We are of the opinion that the requirement of "authorization" restricts the responsibility or liability in labor disputes of employer or employee associations, organizations or their members for unlawful acts of the officers or members of those associations or organizations, although such officers or members are acting within the scope of their general authority as such officers or members, to those associations, organizations or other officers or members who actually participate in the unlawful acts, except upon clear proof that the particular act charged, or acts generally of that type and quality, had been expressly authorized, or necessarily followed from a granted authority, by the association or non-participating member sought to be charged or was subsequently ratified by such association, organization or member after actual knowledge of its occurrence.

330 U.S. at 406–407, 67 S.Ct. at 781 (footnote omitted).

■ We further noted that following *United Brotherhood of Carpenters*, Congress provided a right of action for money damages in certain labor disputes under the Taft–Hartley Act (see n. 2, *supra* ), but that in *Gibbs, supra*, the United States Supreme Court stated that "the responsibility of a union for the acts of its members and officers [under the Taft–Hartley Act] is to be measured by reference to ordinary doctrines of agency, rather than the more stringent standards of § 6 [of the Norris–LaGuardia Act]." 383

U.S. at 736, 86 S.Ct. at 1144. Hence, we correctly concluded that both under Section 6 of the Norris–LaGuardia Act, and under Section 8 of our Anti–Injunction Act, a higher showing was required than that required under the common law rules of agency.

In light of the above, it is now considerably jarring to realize that we originally held Local 107 liable in this case, and precipitated their imminent demise in Bankruptcy Court, even though the Local itself, either through its top officers or anything approaching a majority of its 5,000 members, never authorized or condoned the shootings that occurred here in any way. Indeed, the result reached in our first opinion appears to thwart directly the purposes behind our Anti–Injunction Act as described above. *Mea Culpa.* The mistake, however, was easily made.

Part II of our original opinion in this case was entitled "Participation of Local 107." We thought it right to consider whether the union itself, Local 107, "participated" in the drama and so became liable to compensate the victims. We decided that it was proper for the jury in this case to conclude that enough of the membership of Local 107 and of its officers took part in the tragic events such that it was lawful to hold Local 107 liable. (Hence, we reversed the Superior Court's decision to the contrary.) To see how we came to that conclusion, and why it was incorrect, we must set forth again the detailed facts upon which we relied.[3] We stated:

"At this point, an exacting review of the 1,113 page trial transcript is necessary. The following people were primary participants in this tragedy. At the time of the strike and shooting, Joseph Cimino was president of Local 107. John Smalley was a business/agent recording secretary of the Local and chief negotiator in the ongoing discussions with 3M. Mr. Smalley was, according to his own testimony, responsible for control of the picket line. N.T. February 28,

---

**3.** Rather than force the reader constantly to refer back to our earlier opinion, it seems to me to make more sense simply to restate our factual summary therefrom, and comment afterwards.

1984 at 371. William Crossan was an employee of 3M, the local union's chief steward and a member of its negotiating committee. Robert Kendig was a union steward and employee at the Bristol plant and also a member of the negotiating committee. Robert Ballinger was an employee of 3M, a member of Local 107 and the individual who fired the pistol, injuring fellow picketers Gajkowski and Schipake and 3M security guard Abate.

    .    .    .    .    .

"On that fateful day, [January 25, 1980], Crossan, Kendig, Ballinger and two others went to the 'Tulleytown Tank' for lunch. Crossan stated that the men 'drank continuously' for a couple of hours. *Id.* at 424. Upon their return to the line, Crossan and Kendig began handing out leaflets to non-striking employees. *Id.* at 425. 3M Security supervisor Joseph Boxmeyer asked Crossan and Kendig to stop doing this on 3M's property. N.T. February 29, 1984 at 79–81. Kendig went on to let air out of the tires of cars on the 3M lot. N.T. February 28, 1984 at 429; February 29, 1984 at 81. Later, Crossan and Kendig left in Kendig's truck, ostensibly to check on Kendig's children. Before leaving, a striker overheard Kendig remark that he was going to get a gun to shoot out 3M's lights and security camera. N.T. February 28, 1984 at 195. At Kendig's house, both Crossan and Kendig had a shot of alcohol before coming back to the line. While they were riding back to the plant, Kendig showed Crossan a gun he was storing in the trunk. Crossan made no objection to Kendig's bringing the gun on the line. N.T. February 28, 1984 at 432–434.

"Kendig took the gun into the strike trailer across the street from 3M's property. Strikers were assembled in the trailer playing cards. Kendig displayed the gun to all present and exclaimed 'deal me in.' N.T. February 27, 1984 at 121. At this, Kendig laughed and left the trailer. *Id.* at 122. The record is filled with evidence that large amounts of alcohol were consumed on the line that evening. *Id.* at 110, 113, 116; February 28, 1984 at 175, 177. Ballinger,

who would later fire the injurious shots, was described by a number of witnesses as drunk. N.T. February 27, 1984 at 118; February 28, 1984 at 182. Soon, rocks and bottles were being thrown at the plant. N.T. February 27, 1984 at 126. Two witnesses credited Kendig with throwing the first bottle and shouting, 'This will get something started.' *Id.*, N.T. February 28, 1984 at 292. George Cook, the picket line captain, testified that he had been drinking and took part in throwing the rocks and bottles. N.T. February 28, 1984 at 275–76. One bottle went astray and hit Ballinger on the head. N.T. February 27, 1984 at 128; February 28, 1984 at 252.

"The once peaceful picket line deteriorated into a raucous mob. One witness described the growing tension and two witnesses characterized the situation as 'rowdy.' N.T. February 27, 1984 at 130; February 28, 1984 at 190. Joseph Boxmeyer, 3M's security head, noted in his log that the picketers were attempting to create a confrontation through their actions. N.T. February 29, 1984 at 85; Plaintiffs' Exhibit No. 59. Some time after 7:00 P.M., one picketer and an employee of 3M reported shots. N.T. February 27, 1984 at 134; Plaintiffs' Exhibit No. 36. Crossan then met Kendig near the gas station across the street from the plant; Kendig handed Crossan the pistol and urged Crossan to shoot out the lights at the plant. Crossan replied, 'I don't know how.' Kendig offered to instruct him; Crossan decided to go to the men's room. N.T. February 28, 1984 at 434–35. He admitted that he did not attempt to restrain Kendig or contact Smalley. *Id.* at 436. After Crossan departed, Kendig met up with Ballinger and Ballinger fired the shots from Kendig's gun which injured appellants.

"Jack Smalley, business agent for Local 107, testified that he was responsible for the conduct of the strike at the Bristol 3M plant. N.T. February 28, 1984 at 371. He asserted that Local 107 had a rule against drinking alcoholic beverages on the picket line. *Id.* at 376, 379. At least four witnesses testified there was no such rule. N.T. February 27, 1984 at 110; February 28, 1984 at 236, 241, 273. Smal-

ley stated that he was aware of drinking on the line but admitted he took no steps to curb it. *Id.* at 388–390. George Cook testified that on one occasion he observed George Massimini, another business agent of Local 107, delivering alcoholic beverages to the strikers. *Id.* at 279–80.

.        .        .        .        .

"This record also includes circumstantial evidence that Joseph Cimino, president of Local 107, sanctioned the assault on the Bristol plant. Three days prior to the events of January 25, Cimino attended a meeting at the Washington, D.C. office of the IBT to discuss a number of unresolved issues. Present were Cimino, Norman Weintraub, an IBT economist, Joseph Cotter, an IBT staff employee, Nelson Schmidt, a 3M attorney, and Robert Hanson, a 3M personnel manager. At the conclusion of the meeting, Cimino and Hanson agreed to re-evaluate their positions during a follow-up phone call. Mr. Hanson's notes, introduced into evidence by stipulation, reveal the content of his conversation with Cimino on January 25, the day of the melee:

> Joe Cimino called me answering my call to Cotter. Summary of conversation: We need all 13 items I gave you yesterday. People are adamant and strong. I've spent a lot of time on picket line. They won't go back to work for a few cents. I've got to represent them. We're going to extend our picketing. I've got approval from the Int. *We're going to do what we have to do—it's been peaceful for ten weeks—it's getting hot now—they are up tight—we've got to get mgmt's attention.* I have no malice—I won't lie to you or sandbag you. These people don't like being 2nd class citizens—they compare rates and benefits with St. Paul, and other three plants & don't like being behind. Everybody has sick days these days. You get injunction & then tell us where you're shipping all boxcars—it's written on cars 'To Anchor' or 'To Leno' —that's really rubbing salt in wounds. First time they're doing it. We're have (sic) a demonstration Mon. in Phil.— 95% of 3M will be there and some truck drivers.

Plaintiff's Exhibit No. 28 (emphasis added). The appellees contend that Mr. Cimino's statement refers to legitimate efforts to extend the picketing to other 3M facilities and a rally to be held in Philadelphia to demonstrate support for Local 107...." (footnote omitted).

■ On the basis of these facts, we concluded in Part II of our original opinion that the jury could properly infer that there was sufficient evidence to find that enough of the membership of Local 107 and enough of its officers took part in the tragic events of January 25, 1980, to hold the Local itself liable *as a participant* for the personal injuries caused. The logic of this conclusion appears unexceptional. It is straightforward, and it is familiar to any practicing lawyer. It is deceptively alluring even though the logic produces a result that is at odds with the overriding purpose and intent of Section 8 of the Anti–Injunction Act. Our initial opinion was at war with itself, but the flaw in the logic of Part II thereof is not readily obvious. Upon due reflection, however, I have concluded that Part II comes to an erroneous conclusion because it improperly applies, without expressly saying so, the doctrines of *respondeat superior*, and vicarious liability to this situation. These are standard doctrines of agency law. They are, however, precisely the doctrines or types of analyses that we are *forbidden* to apply under Section 8 of our Anti–Injunction Act! To do so *sub silentio* was error. They crept into use because we chose to employ them in order to address the question of whether Local 107 "participated" in the acts causing the injuries at issue. Under these facts, it was the wrong question to ask. While Section 8 of our statute and Section 6 of the federal statute both use the term "participation in" in apparent reference to a labor organization, surely that term was not meant to provide a back-door invitation to the courts to apply doctrines like *respondeat superior* which could not be applied directly; nor could it have been intended to be a back-door or loophole available for us to introduce doctrines whose use would effectively dismantle the statutes themselves.

In order to correct the blatant error which undermined the legislative intent and placed organized labor in the precarious position sought to be avoided by the Pennsylvania Labor Anti–Injunction Act, the extraordinary step was taken of granting the Application for Reconsideration *Nunc Pro Tunc* as well as the Amended Application for Reconsideration *Nunc Pro Tunc.*

The key to my present analysis comes from a careful reading of and reflection upon, *United Brotherhood of Carpenters v. United States, supra,* particularly Mr. Justice Frankfurter's dissenting opinion. He contended that Section 6 of the Norris–LaGuardia Act was:

... directed against decisions by some of the federal courts in litigation involving industrial controversies. The abuse was misapplication of the law of agency so that labor unions were held responsible for the conduct of individuals in whom was lodged no authority to wield the power of the union. By undue extension of the doctrine of conspiracy, whereby the act of each conspirator is chargeable to all, unions were on occasion held responsible for isolated acts of individuals, believed in some instances to have been *agents provocateurs* who held a spurious membership in the union during a strike. Congress merely aimed to curb such an abusive misapplication of the principle of agency. It did not mean to change the whole legal basis of collective responsibility. By talking about "actual authorization," Congress merely meant to emphasize that persons for whose acts a corporation or a union is to be held responsibile should really be wielding authority for such corporation or union.

The Congressional purpose behind § 6, then, is clear. All that Congress sought to do was to eliminate an extraneous doctrine that had crept into some of the decisions, whereby organizations were held responsible not for acts of agents who had authority to act, but for every act committed by any member of the union merely because he was a member, or because he had some relation to the union although not authorized by virtue of

his position to act for the union in what he did. And so Congress charged the federal courts with the duty to look sharply to the relation of the individual to the affairs of the organization, and not to confound individual with union unless the individual is clothed with power by the union, in the ordinary way of union operation, in doing what he does for the union. A basis for liability which has entered into the warp and woof of our law, as is true of the responsibility of collective bodies for the acts of their agents, should not be deemed to have been uprooted by an enactment which merely emphasizes that basis and rules out its distortions. 1932 was too late in the day for Congress not to have known that unions, like other organizations, act only through officers, and that unions do not, any more than do other organizations, explicitly instruct their officers to violate the ... [law].

330 U.S. at 418–420, 67 S.Ct. at 787–788 (footnote omitted).

■ This is, of course, the position *rejected* by the majority in *United Brotherhood of Carpenters*. But Mr. Justice Frankfurter's sharp dissent clarifies the points that were actually decided in that case. Any organization such as a corporation, a partnership, or an unincorporated association (like Local 107), to the extent that it has a legal existence distinct from that of its members themselves, is a fictitious legal entity. As such, the organization itself can *only* act through its agent or agents. Officers are merely a special type of agent authorized to undertake specific types of activities. Any time that legal liability is imposed on such an organization, it is vicarious liability or liability based on *respondeat superior*. The organization is held liable for the acts or derelictions of its agents. Mr. Justice Frankfurter correctly notes that a principal abuse that occurred prior to the passage of the Norris–LaGuardia Act was that unions and their individual members were held liable as co-conspirators when other members engaged in unlawful activity. His contention that, by passing the Norris–LaGuardia Act, Congress had only attempted to modify or correct the application of agency principles in such cases,

rather than substantially curtail the application of such doctrines, did not prevail, however. The majority focused on the concept of "authorization" and limited the liability in labor disputes of employer or employee associations or organizations to those situations where unlawful acts were expressly authorized or necessarily followed from a granted authority, or where there was subsequent ratification.[4]

On the basis of that analysis, it is clear on this record that neither the shootings that occurred here themselves, nor the deplorable combination of escalating tensions, alcohol and firearms that preceded them, were expressly authorized by the top officers or leadership or the full membership of Local 107. Nor can I find that the violent acts necessarily followed from the authority granted by the union to the members directly involved in the misdeeds. The union members involved had express authority to picket from their membership, nothing more. They certainly had no expressed or general authority to engage in violence that I can detect in this record.[5] I am mindful of Mr. Justice Frankfurter's argument to the effect that under these standards, a large union would never deliberately authorize or formally and expressly vote to authorize the use of violence or other unlawful tactics that would later

4. See, 330 U.S. at 406–407, 67 S.Ct. at 781. The relevant passage is quoted in full at pp. 537–38, *supra.*

It must be noted that both Section 8 of our statute, and Section 6 of the Norris–LaGuardia Act, protect *employer* associations and organizations involved in labor disputes from extensive vicarious liability, as well as employee entities.

Subsequent ratification of the violent acts committed here by Local 107 did not occur and is not an issue in this case.

In contrast to the authorization theory adopted herein, under a *respondeat superior* theory, a master is liable for damages caused by the torts of its servants performed in the scope of their employment, regardless of the master's authorization (or ratification) of the misconduct. Restatement (Second) of Agency § 216 (1958).

5. As footnote 8 of our original opinion indicates, the notes kept by Mr. Robert Hanson with respect to statements by Local President Cimino three days before the shooting, to the effect that things were going to get hot, in and of themselves, are too ambiguous to prove authorization by Local 107. The relevant text from Mr. Hanson's notes is fully set forth at p. 539, *supra.*

give rise to a claim for damages. I agree that formal *de jure* authorization would seldom, if ever, occur in a large, well counseled union. Nevertheless, *de facto* authorization would always be a possibility, for example, where the union leadership informally ordered the use of violence without a formal meeting or formal vote. Be that as it may, there is no evidence here that these shootings, or the chaos that led to them, was authorized by the leadership of Local 107, either *de jure* or *de facto*. The fact that individual shop stewards, negotiating agents or a picket line manager were involved in the events leading to the shooting does not change the result. There is virtually no evidence that they were ordered or authorized in any way by the leadership, or the full 5,000 person membership of Local 107, to do what they did. There is no evidence whatever that they exercised, or were granted the discretion to exercise, the authority of the Local itself to engage in violence. Moreover, even if the individuals at fault here are to be considered officers of the Local, both Section 8 of the Anti–Injunction Act (as well as Section 6 of the Norris–LaGuardia Act) expressly excludes organizational liability for "the unlawful acts of individual officers," as well as the unlawful acts of mere members or agents, unless the organization authorized the acts. That simply did not happen here.

What remains of the question of whether Local 107 was guilty of "participation in" the illegal acts in question? While we originally were of the opinion that Local 107 was liable under this language, which we held was to be applied with reference to the number of persons involved in the illegal acts, the status of these persons in the organization, and whether the organization was aware of and in a position to exercise control over such acts, I now recognize, as explained above, that we improperly adopted standards necessarily involving the agency law concepts of vicarious liability and *respondeat superior* to answer the question. Does the participation concept now retain any vitality aside from using agency law principles to apply it, however, and if not, are we reading a clause out of Section 8 of our statute? My review of cases in other jurisdictions with

respect to the concept of participation provides few guidelines. My reading of the language of our own statute, however, as well as that of the federal Act, inevitably draws me to the observation that neither statute is drafted as carefully as one might wish. I think it can be plausibly argued that the term "actual participation in" in our statute is meant to refer to the exposure to liability of an individual officer or member; and that an association or organization can only be found liable for damages if it authorized or ratified the unlawful acts. This certainly would be a more natural use of the English language, that is, to read the statute to the effect that individuals (but not legal entities themselves) participate in illegal activity. The statutes were drafted conjunctively, of course, and potential organizational liability was disposed of in the same sentence in which potential individual liability is also mentioned. Whether my reading is accurate or not (and it must be conceded that our statute recognizes that an association or organization may be "participating or interested in a labor dispute"—although this implies a formal, authorized, organizational type of participation), I, nevertheless, remain convinced on the basis of *United Brotherhood of Carpenters* that an organization's participation cannot be determined under our statute by reference to principles of vicarious liability or *respondeat superior.*[6] What *is* left, however, is the possibility that the vast majority of a union's members (or employer strike breakers) break rank with their leadership and spontaneously plan or engage in some sort of mob violence. While we do not expressly address or decide the question, that would be a reasonable and limited example of a situation where unlawful acts were not authorized by an organization, but were effectively participated

---

**6.** There are only a handful of state court decisions that have reached the opposite conclusion. See, *e.g., Buchanan v. International Brotherhood of Teamsters,* 617 P.2d 1004, 94 Wash.2d 508 (1980); *Titus, et al v. Tacoma Smeltermen's Union Local No. 25,* 383 P.2d 504, 62 Wash.2d 461 (1963); *United Brotherhood of Carpenters v. Humphreys,* 127 S.E.2d 98, 203 Va. 781 (1962); *Nelson v. Haley,* 111 N.E.2d 812, 232 Ind. 314 (1953). For a general review of the subject, see, Note, *Tort Liability of Labor Unions for Picket Line Assaults,* 10 U.Mich.J.L.Ref. 517, at 525–528 (1977).

in by it.[7] It would also be consistent with the goals and purposes of our statute.

In any event, I am certain that on the facts in this case, it would be contrary to our statute to hold Local 107 (comprised of some 5,000 members) liable for the misdeeds of a few malefactors where their acts were not in any way authorized by the Local or its leadership.

I am aware that a number of academicians, specializing in the field of law and economics, would argue *that* labor unions are not in the precarious position they were 50 years ago; *that* they are often large enterprises better able to bear the loss of picket line injuries through insurance or "loss-spreading" than previously; and *that* as a matter of policy the courts, therefore, should impose through creative interpretation the doctrine of *respondeat superior* on unions in order to compensate the victims of picket line violence and force unions to bear the loss.[8]

Whatever the merits of such arguments, we are not free to adopt them. Some years ago, our legislature made the judgment that imposing such liability on organizations or associations involved in a labor dispute is against public policy and would tend to the destruction of labor unions, a fate to be avoided. We are bound by the judgment of the legislature on such policy questions unless and until that judgment is changed. We must not engage in judicial legerdemain to undermine a legislative purpose so clearly expressed. Nor should we tinker w'th detailed statutory enactments that have been largely accepted by our society as necessary to preserve the rights and viability of labor unions, and indeed all parties in a labor dispute.

For the reasons set forth above, the original opinion and order in this case is withdrawn and the judgment of the Superior Court is affirmed.

---

7. In this connection, see, *Lubliner v. Reinlib*, 50 N.Y.S.2d 786, 184 Misc. 472 (1944).

8. See, *e.g.*, Comment, *The Liability of Labor Unions for Picket Line Assaults*, 21 U.C.L.A.L.Rev. 600 (1973).

ZAPPALA, J., files a concurring opinion in which NIX, C.J., joins.

FLAHERTY, J., files a dissenting opinion in which McDERMOTT and STOUT, JJ., join.

ZAPPALA, Justice, concurring.

I concur in the result, and as to the law, the facts, and the application of the law to the acts, I retain the position taken in my concurring and dissenting opinion reported at 515 Pa. 516, 536, 530 A.2d 853, 863.

NIX, C.J., joins in this concurring opinion.

FLAHERTY, Justice, dissenting.

I dissent and would reaffirm this Court's previous decision in this case, on the basis of the opinion authored by the former Mr. Justice Hutchinson. *Gajkowski v. International Brotherhood of Teamsters*, 515 Pa. 516, 530 A.2d 853 (1987).

This opinion joined by McDERMOTT, J. and STOUT, J.